**FITZGERALD JOSEPH LLP**
JACK FITZGERALD (SBN 257370)
*jack@fitzgeraldjoseph.com*
PAUL K. JOSEPH (SBN 287057)
*paul@fitzgeraldjoseph.com*
MELANIE PERSINGER (SBN 275423)
*melanie@fitzgeraldjoseph.com*
TREVOR M. FLYNN (SBN 253362)
*trevor@fitzgeraldjoseph.com*
CAROLINE S. EMHARDT (SBN 321222)
*caroline@fitzgeraldjoseph.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741
***Counsel for Plaintiff***

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Tara Amado, on behalf of herself, all others similarly situated, and the general public,<br><br>Plaintiff,<br><br>v.<br><br>The Procter & Gamble Co.,<br><br>Defendant. | Case No: 22-cv-5427<br><br><u>CLASS ACTION</u><br><br>**COMPLAINT FOR VIOLATIONS OF:**<br><br>**CAL. BUS. & PROF. CODE §§17200 *et seq.*;**<br><br>**CAL. BUS. & PROF. CODE §§17500 *et seq.*;**<br><br>**CAL. CIV. CODE §§ 1750 *et seq.*; and**<br><br>**BREACH OF EXPRESS & IMPLIED WARRANTIES**<br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Tara Amado, on behalf of herself, all others similarly situated, and the general public, by and through her undersigned counsel, hereby sues The Procter & Gamble Co. ("P&G"), and alleges the following upon her own knowledge, or where she lacks personal knowledge, upon information and belief, including the investigation of her counsel.

## INTRODUCTION

1. P&G sells Metamucil, fiber-powder dietary supplements, that it claims to help support "Healthy Blood Sugar Levels," "Appetite Control," and "Digestive Health."

2. P&G's "Appetite Control," "Blood Sugar," and "Digestive Health" representations are false or at least highly misleading because compelling scientific evidence demonstrates that the Metamucil Powders—due to their added sugar content—actually decrease appetite control, harm blood sugar levels, and damage digestive health.

3. Ms. Amado brings this action against P&G on behalf of herself, similarly situated Class Members, and the general public to enjoin P&G from deceptively marketing the Metamucil Powders, and to recover compensation for injured Class Members.

## JURISDICTION & VENUE

4. This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d)(2) (The Class Action Fairness Act) because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a State different from P&G. In addition, more than two-thirds of the members of the class reside in states other than the state in which P&G is a citizen and in which this case is filed, and therefore any exceptions to jurisdiction under 28 U.S.C. § 1332(d) do not apply.

5. The Court has personal jurisdiction over P&G as a result of P&G's substantial, continuous and systematic contacts with the State, and because P&G has purposely availed itself of the benefits and privileges of conducting business activities within the State, including by marketing, distributing, and selling the Metamucil Powders in California.

6.      Venue is proper in this Northern District of California pursuant to 28 U.S.C. § 1391(b) and (c), because P&G resides (*i.e.*, is subject to personal jurisdiction) in this district, and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## DIVISIONAL ASSIGNMENT

7.      This civil action arises out of the acts and omissions of P&G, which occurred in San Mateo County. Pursuant to Civil Local Rule 3-2(c), (d), this action is correctly assigned to the San Francisco or Oakland Division.

## PARTIES

8.      Plaintiff Tara Amado is a resident of California.

9.      Defendant P&G is an Ohio corporation with its principal place of business in Cincinnati, Ohio.

## FACTS

### I.   P&G Markets the Metamucil Powders as Helping to Support Healthy Blood Sugar Levels, Heart Health, Appetite Control, and Digestive Health

10.     P&G sells a variety of products under the Metamucil brand name, including fiber-powder dietary supplements to which it adds large amounts of sugar (the "Metamucil Powders" or "Products").[1]

11.     On the front of the Metamucil Powder labels, P&G represents that they help support "Appetite Control," "Heart Health by Lowering Cholesterol,"[2] "Healthy Blood Sugar Levels," and "Digestive Health."

12.     To reinforce the message that the Metamucil Powders are effective in providing these claimed benefits, P&G also labels the Metamucil Products with a circular symbol that states "#1 Doctor Recommended Brand."

---

[1] The Metamucil Powders challenged in this lawsuit include those varieties of Metamucil that contain added sugar, namely Metamucil's Unflavored and Orange Flavored Fiber Powders.

[2] Plaintiff challenges this and other heart related labeling claims on the Metamucil Powders only under her causes of action for breach of express and implied warranty.

1

**Orange Metamucil Powder**

2

3

4

5

6

7

8





9

10

11

12

13

14

15

16

17

18

19

20    13.    P&G's "Appetite Control," "Heart Health," "Blood Sugar," and "Digestive Health"

21    representations are important to consumers, who, absent believing the Metamucil Powders provides these

22    benefits, would have no reason to buy this dietary supplement.

23    14.    The "Doctor Recommended" representation, is also important to Metamucil consumers, as

24    it reinforces and lends credibility to the message that the Metamucil Powders are effective at providing the

25    claimed benefits and are backed by scientific evidence because a reasonable consumer would assume

26    doctors would not recommend a product not backed by science and likely to detriment overall health.

27

28

15.     On the back of the label, P&G instructs consumers on how to "How to Take Metamucil." For example, on P&G's orange flavored Metamucil Powder, it tells consumers that for "Digestive Health," "Heart Health by Lowering Cholesterol" and "Healthy Blood Sugar Levels" they should take "1 Rounded Tablespoon up to 3 times per day," and for "Appetite Control" take "2 Rounded Tablespoons up to 3 times per day."

**Orange Metamucil Powder**



16.     Following the appetite control instructions for the unflavored and orange flavored Metamucil Powders, therefore, would lead a consumer to drink up to 21g and 48g of added sugar per day, respectively.

17.     The average consumer would reasonably expect that adding the Metamucil Powders to their diet "Helps Support: Appetite Control[,] Heart Health by Lowering Cholesterol[,]  Healthy Blood Sugar

Levels [and] Digestive Health" as P&G represents. This is particularly true given that the Metamucil Powders are marketed as a dietary supplement.

18.     Because of these representations, the average consumer would not expect that consuming the Metamucil Powders as instructed would actually decrease appetite control, harm blood sugar levels and heart health, and damage digestive health.

19.     Further, the average consumer is unaware that strong scientific evidence demonstrates consuming the amount of sugar in the Metamucil Powders, as instructed, would actually decrease appetite control, harm blood sugar levels, and damage digestive health.

20.     P&G's claims, therefore, are false and misleading to the reasonable consumer.

## II.     Scientific Studies Demonstrate that P&G's Representation that Metamucil Helps Support Healthy Blood Sugar Levels is False and Misleading

21.     On the Metamucil Powders' labeling, P&G represents that it "Helps Support: . . . Healthy Blood Sugar Levels" and instructs consumers that, for "Healthy Blood Sugar Levels," "before each meal" they should take "1 Rounded Teaspoon" of unflavored and "1 Rounded Tablespoon" of orange flavored Metamucil "up to 3 times per day."

22.     P&G knows its "Healthy Blood Sugar Levels" representations are important to reasonable consumers. On its website, for example, it states that "Healthy Blood Sugar Levels [are] Important" because "[o]ver time regularly eating large amounts of simple processed sugars can impact your body's ability to maintain healthy blood sugar levels" and "[i]f your blood sugar levels are consistently elevated, you could be diagnosed with prediabetes."[3]

23.     But P&G's blood sugar labeling claims are false or at least highly misleading because following P&G's instructions leads to the consumption of amounts of sugar that the average consumer is unaware causes unhealthy fluctuations in blood sugar levels and over time these fluctuations can cause the body to be unable to control blood sugar levels due to insulin resistance, type 2 diabetes, and/or metabolic syndrome.

---

[3]   P&G, "How Psyllium Maintain Healthy Blood Sugar Levels | Metamucil," https://www.metamucil.com/en-us/articles/psyllium-fiber/how-psyllium-fiber-can-help-maintain-healthy-blood-sugar (last visited Sept. 22, 2022).

24.     For example, following P&G's instructions of taking "2 Rounded Tablespoons up to three times per day," leads to the consumption of 192 extra calories from added sugar. And as one scientific analysis showed, an increase of 150 calories per day in sugar related to a 1.1% rise in diabetes prevalence by country, a statistically-significant increase of 11-fold.[4]

25.     There are many other scientific studies, of which the average consumer is unaware, that demonstrate that consuming drinks with added sugar directly harms blood sugar levels.

26.     One large meta-analysis that included data from 34,748 adults found that, "after adjustment for age, sex, energy intake, BMI and other dietary covariates, each additional serving of [sugar sweetened beverage] intake was associated with higher *fasting* glucose"[5] blood levels, which is unhealthy.

27.     This in turn leads to "higher fasting insulin,"[6] levels, which can cause insulin resistance. In fact, studies have shown that "Regular SSB [sugar-sweetened beverage] intake . . . is associated with a greater increase in insulin resistance and a higher risk of developing prediabetes in a group of middle-aged adults."[7]

28.     Another study "aimed to evaluate the relationship between the consumption of selected food groups and insulin resistance, with an emphasis on sugar-sweetened beverages (SSB)" it found that "daily consumption of SSB was related with increased [homeostasis model assessment-insulin resistance] in adolescents."[8]

---

[4] Basu, S., et al., "The Relationship of Sugar to Population-Level Diabetes Prevalence: An Econometric Analysis of Repeated Cross-Sectional Data," *PLOS Online*, Vol. 8, Issue 2 (Feb. 27, 2013).

[5] McKeown, N.M. et al., "Sugar-Sweetened Beverage Intake Associations with Fasting Glucose and Insulin Concentrations Are Not Modified by Selected Genetic Variants in a ChREBP-FGF21 Pathway: A Meta-Analysis," 61 *Diabetologia* 317–330 (2018) (emphasis added).

[6] *Id.*

[7] Ma, J. et al., "Sugar-Sweetened Beverage but Not Diet Soda Consumption Is Positively Associated with Progression of Insulin Resistance and Prediabetes," 146 J. Nutr. 2544–2550 (2016).

[8] Kondaki, K. et al., "Daily Sugar-Sweetened Beverage Consumption and Insulin Resistance in European Adolescents," 16 *Public Health Nutr.* 479–486 (2013).

29. Yet another study examining "the association between sugar-sweetened beverage (SSB) consumption with biomarkers of insulin resistance (IR)" found that "[a]dolescents who consumed a greater amount of SSBs were more likely to have elevated fasting serum insulin[.] "[9]

30. Another study found that "SSB supplementation led to a significant increase in fasting plasma glucose and a strong trend towards a reduction in insulin sensitivity in healthy lean individuals with low physical activity, who otherwise consumed less than 500 mL SSB per week."[10]

31. In short, there is "a clear link between [sugar sweetened beverage] consumption," like the Metamucil Powders challenged here, "and risk of . . . type 2 diabetes."[11] This means consuming the Metamucil Powders causes unhealthy rises and fluctuations in blood sugar levels, which with time will increase one's risk of becoming diabetic or prediabetic and at which point the body loses its ability to regulate or maintain healthy blood sugar levels.

32. Not only does the large amount of free sugar that P&G adds to the Metamucil Powders lead to unhealthy blood sugar levels, studies show that the fiber in the Metamucil Powders does not improve or help control blood sugar levels. Specifically, one controlled, randomized clinical study shows that when one consumes sugar, the fiber in the Metamucil Powders does not improve or help control blood sugar levels.[12]

33. In that study, researchers specifically tested "[t]he effects of incorporating Fybogel (3.5 and 7g doses), **Metamucil** (7g)[,] or guar gum (2.5 and 14.5g doses) in a drink containing 50g glucose on plasma

---

[9] Lin, W.-T. et al., "Fructose-Rich Beverage Intake and Central Adiposity, Uric Acid, and Pediatric Insulin Resistance," 171 *J. Pediatr*. 90–96 (2016).

[10] Sartor F et al., "Adaptive metabolic response to 4 weeks of sugar-sweetened beverage consumption in healthy, lightly active individuals and chronic high glucose availability in primary human myotubes." 52(3) *Euro. J. Nutr.* 937-48 (Apr. 2013). *See also* Teshima N et al., "Effects of sugar-sweetened beverage intake on the development of type 2 diabetes mellitus in subjects with impaired glucose tolerance: the Mihama diabetes prevention study." 61(1) J. *Nutr. Sci. Vitaminol*. 14-9 (2015) ("SSB intake correlated with the predisposition for developing T2DM, possibly by influencing body weight, insulin resistance, and the ability of the pancreatic beta cells to effectively compensate for the insulin resistance").

[11] Malik, Vasanti S., et al., "Sugar-Sweetened Beverages and Risk of Metabolic Syndrome and Type 2 Diabetes," *Diabetes Care*, Vol. 33, No. 11, 2477-83, at 2477, 2480-81 (November 2010) [hereinafter "Malik, 2010 Meta-Analysis"].

[12] H.A. Jarjis et al., "The effect of ispaghula (Fybogel and Metamucil) and guar gum on glucose tolerance in man," 51 *British J. Nutr.* 371-378 (1984).

glucose [and] plasma insulin."[13] While "[b]oth doses of guar gum significantly lowered plasma glucose and plasma insulin responses to the oral glucose load . . . . *Neither Fybogel nor Metamucil had significant effects on plasma glucose responses*."[14]

34.     As seen below in Figure 2, the "[a]ddition of 7 g Metamucil to an oral glucose load of 50 g glucose in 250 ml of solution produced *no [statistically] significant change in postprandial glucose levels* (Fig. 2)."



Fig. 2. Increase in plasma glucose levels (mM) over basal values following ingestion of 50 g glucose in a 250 ml drink (●) with or (○) without 7 g Metamucil in normal subjects. Points are mean values with their standard errors of the mean represented by vertical bars for eight observations.

35.     Other studies confirm that soluble fiber from psyllium—such as that in Metamucil—does not improve or support healthy blood sugar levels as P&G claims. One study found that "less viscous soluble fiber sources such as the pectins and psyllium powder are not effective" for "management of the plasma

---

[13] *Id.*

[14] *Id.* (emphasis added).

glucose concentration in individuals with diabetes" and are "of little or no value in controlling the plasma glucose concentration in individuals with NIDDM."[15]

36.     In short, consuming the high-sugar Metamucil Powders results in unhealthy changes in blood sugar levels. Thus, P&G's claim that Metamucil "Helps Support: . . . Healthy Blood Sugar Levels" is false. These representations are not only false but likely to mislead reasonable consumers who, without referencing such scientific studies, would not know these claims are false.

**III.     Scientific Studies Demonstrate that P&G's Representations that Metamucil Helps Support Heart Health is False and Misleading**

37.     On the Metamucil Powder labeling, P&G represents that it "Helps Support: . . . Heart Health by Lowering Cholesterol Levels" and instructs consumers that, for "Heart Health by Lowering Cholesterol Levels" "before each meal" they should take "1 Rounded Teaspoon" of unflavored and "1 Rounded Tablespoon" of orange flavored Metamucil "up to 3 times per day."

38.     The scientific literature demonstrates that consumption of sugar-sweetened beverages harm and detriment heart health and cholesterol levels.

39.     In a study of preschool children published in January 2020, researchers found that higher consumption of sugar-containing beverages was significantly associated with elevated CMR (cardiometabolic risk) scores. The researchers stated that their "findings support recommendations to limit overall intake of SCB in early childhood, in [an] effort to reduce the potential long-term burden of CMR."[16]

40.     Data obtained from NHANES surveys demonstrate that adults who consumed 10% - 24.9% of their calories from added sugar had a 30% greater risk of cardiovascular disease (CVD) mortality than those who consumed 5% or less of their calories from added sugar. In addition, those who consumed 25% or more of their calories from added sugar had an average 275% greater risk of CVD mortality than those

---

[15] Nuttall, F., "Perspectives in Diabetes - Dietary Fiber in the Management of Diabetes," 42 *Diabetes* 503-08 (April 1993).

[16] Eny, KM, et al., "Sugar-containing beverage consumption and cardiometabolic risk in preschool children." 17 *Prev. Med. Reports* 101054 (Jan. 14, 2020).

who consumed less than 5% of calories from added sugar. Thus, "[t]he risk of CVD mortality increased exponentially with increasing usual percentage of calories from added sugar[.]"[17]



Figure 1. Adjusted Hazard Ratio (HR) of the Usual Percentage of Calories From Added Sugar for Cardiovascular Disease Mortality Among US Adults 20 Years or Older: National Health and Nutrition Examination Survey Linked Mortality Files, 1988-2006

Histogram of the distribution of usual percentage of calories from added sugar in the population. Lines show the adjusted HRs from Cox models. Midvalue of quintile 1 (7.4%) was the reference standard. The model was adjusted for age, sex, race/ethnicity, educational attainment, smoking status, alcohol consumption, physical activity level, family history of cardiovascular disease, antihypertensive medication use, Healthy Eating Index score, body mass index, systolic blood pressure, total serum cholesterol, and total calories. Solid line indicates point estimates; dashed lines indicate 95% CIs.

41.    The NHANES analysis also found "a significant association between sugar-sweetened beverage consumption and risk of CVD mortality," with an average 29% greater risk of CVD mortality "when comparing participants who consumed 7 or more servings/wk . . . with those who consumed 1 serving/wk or less . . . ."[18]

42.    Data from the Nurses' Health Study consistently showed that, after adjusting for other unhealthy lifestyle factors, those who consumed two or more sugar-sweetened beverages per day had a 35% greater risk of coronary heart disease compared with infrequent consumers. [19]

---

[17] Yang, Quanhe, et al., "Added Sugar Intake and Cardiovascular Diseases Mortality Among US Adults," *JAMA*, at E4-5 (pub. online, Feb. 3, 2014).

[18] *Id.* at E6.

[19] Fung, T.T., et al., "Sweetened beverage consumption and risk of coronary heart disease in women." 89 *Am. J. Clin. Nutr.* 1037-42 (Feb. 2009).

43.     In another prospective cohort study, consumption of sugary beverages was significantly shown to increase risk of CHD, as well as adverse changes in some blood lipids, inflammatory factors, and leptin.[20]

44.     Sugar-sweetened beverage consumption is also associated with several CHD risk factors. For example, consumption of sugary beverages has been associated with dyslipidemia,[21] obesity,[22] and increased blood pressure.[23]

45.     Sugar-sweetened beverage consumption is also associated with worse blood cholesterol levels. A study of more than 6,000 participants in the Framingham Heart Study found those who consumed more than 1 soft drink per day had a 25% greater risk of hypertriglyceridemia, and 32% greater risk of low HDL cholesterol than those who consumed less than 1 soft drink per day.[24]

46.     A systematic review and meta-analysis of 37 randomized controlled trials concerning the link between sugar intake and blood pressure and lipids found that higher sugar intakes, compared to lower

---

[20] Koning, L.D., et al., "Sweetened Beverage Consumption, Incident Coronary Heart Disease, and Biomarkers of Risk in Men." 125 *Circulation* 1735-41 (2012).

[21] Elliott S.S., et al., "Fructose, weight gain, and the insulin resistance syndrome." 76(5) *Am. J. Clin. Nutr.*, 911-22 (2002).

[22] Faith, M.S., et al., "Fruit Juice Intake Predicts Increased Adiposity Gain in Children From Low-Income Families: Weight Status-by-Environment Interaction." 118(5) *Pediatrics* 2066-75 (2006) ("Among children who were initially either at risk for overweight or overweight, increased fruit juice intake was associated with excess adiposity gain, whereas parental offerings of whole fruits were associated with reduced adiposity gain."); Schulze, M.B, et al., "Sugar-Sweetened Beverages, Weight Gain, and Incidence of Type 2 Diabetes in Young and Middle-Aged Women." 292(8) *JAMA* 927-34 (2004) [hereinafter "Schulze, Diabetes in Young & Middle-Aged Women"]; Ludwig, D.S., et al., "Relation between consumption of sugar-sweetened drinks and childhood obesity: a prospective, observational analysis." 257 *Lancet* 505-508 (2001); Dennison, B.A., et al., "Excess fruit juice consumption by preschool-aged children is associated with short stature and obesity." 99 *Pediatrics* 15-22 (1997).

[23] Hoare, E., et al., "Sugar- and Intense-Sweetened Drinks in Australia: A Systematic Review on Cardiometabolic Risk." 9(10) *Nutrients* 1075 (2017).

[24] Dhingra, R., et al., "Soft Drink Consumption and Risk of Developing Cardiometabolic Risk Factors and the Metabolic Syndrome in Middle-Aged Adults in the Community," 116 *Circulation* 480-88 (2007) [hereinafter "Dhingra, Cardiometabolic Risk"].

sugar intakes, significantly raised triglyceride concentrations, total cholesterol, and low-density lipoprotein cholesterol.[25]

47.     A cross-sectional study among more than 6,100 U.S. adults from the NHANES 1999-2006 data were grouped into quintiles for sugar intake as follows: (1) less than 5% of calories consumed from sugar, (2) 5% to less than 10%, (3) 10% to less than 17.5%, (4) 17.5% to less than 25%, and (5) 25% or more. These groups had the following adjusted mean HDL levels (because HDL is the "good" cholesterol, higher levels are better): 58.7 mg/dL, 57.5, 53.7, 51.0, and 47.7. Mean triglyceride levels were 105 mg/dL, 102, 111, 113, and 114. Mean LDL levels were 116 mg/dL, 115, 118, 121, and 123 among women, with no significant trend among men. Consumers whose sugar intake accounted for more than 10% of calories had a 50% - 300% higher risk of low HDL levels compared to those who consumed less than 5% of calories from sugar. Likewise, high-sugar consumers had greater risk of high triglycerides. All relationships were linear as demonstrated in the charts below.[26]

  

**Figure 1.** Multivariable-Adjusted Mean HDL-C Levels by Level of Added Sugar Intake Among US Adults, NHANES 1999-2006

**Figure 2.** Multivariable-Adjusted Geometric Mean Triglyceride Levels by Level of Added Sugar Intake Among US Adults, NHANES 1999-2006

**Figure 3.** Multivariable-Adjusted Mean LDL-C Levels by Level of Added Sugar Intake Among US Men and Women, NHANES 1999-2006

---

[25] Te Morenga, L., et al., "Dietary sugars and cardiometabolic risk: systematic review and meta-analyses of randomized controlled trials on the effects on blood pressure and lipids," 100(1) *Am. J. Clin. Nutr.* 65-79 (May 7, 2014).

[26] Welsh, J.A., et al., "Caloric Sweetener Consumption and Dyslipidemia Among US Adults," 303(15) *J. Am. Med. Assoc'n*, Vol. 303, No. 15, 1490-97 (April 21, 2010).

48.     Another 10-week experimental feeding study showed that those who were fed 25% of their energy requirements as fructose experienced increases in LDL cholesterol, small dense LDL cholesterol, and oxidized LDL cholesterol, as well as increased concentrations of triglycerides and total cholesterol.[27]

49.     In short, the Metamucil Powders do not help support heart health or improve cholesterol levels.

## IV.     Scientific Studies Demonstrate that P&G's Representation that Metamucil Helps Support Appetite Control is False and Misleading

50.     P&G advises consumers that for "Appetite Control[] take before each meal," "2 Rounded Teaspoons" of unflavored and "2 Rounded Tablespoons" of orange flavored Metamucil "up to 3 times per day." Following P&G's instructions for "Appetite Control" results in consuming up to 21g and 48g of added sugar, respectively.

51.     Because the scientific evidence demonstrates that sugar-sweetened beverage consumption is associated with *decreased* appetite control, P&G's representation that the Metamucil Powders help support appetite control is false, or at least highly misleading.

52.     Excess added sugar consumption leads to weight gain and obesity because insulin secreted in response to sugar intake instructs the cells to store excess energy as fat.

53.     Energy deposition into fat cells by insulin stimulates them to secrete a hormone called leptin, which is a natural appetite suppressant that tells the brain the body is full and can stop eating. Generally, glucose should suppress the hunger hormone, ghrelin, and stimulate leptin. But high insulin levels brought on by high levels of sugar consumption are linked to leptin resistance. When leptin resistance occurs, the brain is desensitized to the hormone and so it no longer "hears" the message to stop eating or control the appetite.[28] Because increased insulin makes the body feel hungry, excess sugar consumption can create a vicious cycle in which the more sugar one eats, the hungrier one feels.

---

[27] Stanhope, K.L., et al., "Consuming fructose-sweetened, not glucose-sweetened, beverages increases visceral adiposity and lipids and decreases insulin sensitivity in overweight/obese humans," 19(5) *J. Clin. Invest'n*, 1322-34 (May 2009).

[28] Shapiro, A., et al., "Fructose-induced leptin resistance exacerbates weight gain in response to subsequent high-fat feeding," 295(5) *Am. J. Physiol. Regul. Integrative Comparative Physiol.* R1370-75 (2008).

54.     A recent meta-analysis by Harvard researchers evaluating change in Body Mass Index per increase in 1 serving of sugar-sweetened beverages per day found a significant positive association between beverage intake and weight gain, indicting a lack of appetite control.[29]

55.     In short, because scientific studies show that consuming high amounts of sugar like that in the Metamucil Powders decreases appetite control, P&G's appetite control representations are false. These representations are not only false but likely to mislead reasonable consumers who, without referencing such scientific studies, would not know these claims are false.

## V.     Scientific Studies Demonstrate that P&G's Representation that Metamucil Helps Support Digestive Health is False and Misleading

While P&G represents that the Metamucil Powders "Help[] Support: . . . Digestive Health," scientific evidence actually shows that consuming sugar-sweetened beverages, like the Metamucil Powders, negatively impacts digestive health in a number of ways. This includes harming the gut microbiota and the gut barrier, which leads to ulcerative colitis, Crohn's disease, celiac disease, irritable bowel syndrome and diarrhea (among other things). P&G's digestive health representations are false and because the average consumer is unaware of this science these representations are also misleading.

### A.     Consuming the Sugar in Metamucil Harms the Microbiota in the Digestive Tract

56.     The microbiota that lives in the digestive tract is crucial to digestive health.

57.     Further, diet plays a central role in shaping the microbiota that make up the gut biome in human digestive tracts. In fact, studies "suggest that diet has a dominant role over other possible variables such as ethnicity, sanitation, hygiene, geography, and climate, in shaping the gut microbiota."[30]

---

[29] Malik, V.S., et al., "Sugar-sweetened beverages and BMI in children and adolescents: reanalyses of a meta-analysis," 29 *Am. J. Clin. Nutr* 438-39 (2009).

[30] De Filippo, C., et al., "Impact of diet in shaping gut microbiota revealed by a comparative study in children from Europe and rural Africa," 107(33) *PNAS* 14691-14696 (August 17, 2010); *see also* Brown, K, et al., "Diet-Induced Dysbiosis of the Intestinal Microbiota and the Effects on Immunity and Disease," 4 *Nutrients* 1095-1119 (2012) ("the composition of the gut microbiota strongly correlates with diet as demonstrated by a study assessing the relative contributions of host genetics and diet in shaping the gut microbiota" "dietary changes could explain 57% of the total structural variation in gut microbiota whereas changes in genetics accounted for no more than 12% This indicates that diet has a dominating role in shaping gut microbiota") [hereafter "Brown, Diet-Induced Dysbiosis of the Intestinal Microbiota"].

58.     "[D]iets rich in simple sugars favor the expansion of [harmful microbial] organisms . . ."[31] in at least four distinct ways.

59.     First, simple sugars serve as a nutrient for harmful bacteria and "[r]ecent studies have shown that high intake of sugars increase the relative abundance of [harmful] Proteobacteria in the gut, while simultaneously decreasing the abundance of [beneficial] Bacteroidetes. "[32]

60.     Second, and importantly, high sugar diets result in "lost gut microbial diversity."[33]

61.     Third, independent of their effect as a nutrient for harmful microbiota, because consuming sugar increases bile output, "[r]efined sugars," also "mediate the overgrowth of opportunistic[, harmful] bacteria like C. difficile and C. perfringens,"[34] which feed on the bile.

62.     Fourth, sugar "can impact gut colonization by the microbiota independently of their ability to serve as nutrients" since both "fructose and glucose silence a critical colonization factor, called Roc, in a widely distributed gut commensal bacterium B. thetaiotaomicron."[35]

63.     These changes in the gut microbiota composition harm digestive health and increase risk of chronic digestive track conditions.

---

[31] Townsend II, G., et al., "Dietary sugar silences a colonization factor in a mammalian gut symbiont," 116(1) *PNAS* 233-238 (January 2, 2019) [hereinafter "Townsend II, Dietary sugar silences a colonization factor"].

[32] Satokari, R., "High Intake of Sugar and the Balance between Pro- and Anti-Inflammatory Gut Bacteria," *Nutrients* 2020 May, 12(5), 1348 (published online May 8, 2020) [hereinafter "Satokari, High Intake of Sugar"].

[33] Ho Do, M., et al., "High-Glucose or -Fructose Diet Cause Changes of the Gut Microbiota and Metabolic Disorders in Mice without Body Weight Change," 10 *Nutrients* 761 (June 13, 2018) [hereinafter "Ho Do, High-Glucose or -Fructose Diet Cause Changes of the Gut Microbiota and Metabolic Disorders "]; *see also* Jian-Mei Li, et al., "Dietary fructose-induced gut dysbiosis promotes mouse hippocampal neuroinflammation: a benefit of short-chain fatty acids," 7 *Microbiome* 98 (June 29, 2019) ("The abundance of Bacteroidetes was significantly decreased and Proteobacteria was significantly increased in fructose-fed mice") [hereinafter "Jian-Mei Li, Dietary fructose-induced gut dysbiosis"].

[34] Brown, Diet-Induced Dysbiosis of the Intestinal Microbiota, *supra* n.30.

[35] Townsend II, Dietary sugar silences a colonization factor, *supra* n.31 ("dietary simple sugars can suppress gut colonization in a commensal bacterium just by altering the levels of a colonization factor [know as Roc] dispensable for the utilization of such sugars.").

64. For example, "[e]vidence suggests that the composition of the intestinal microbiota can influence susceptibility to chronic disease of the intestinal tract including ulcerative colitis, Crohn's disease, celiac disease and irritable bowel syndrome . . . ."[36]

65. In sum, "high sugar intake may stagger the balance of microbiota to have increased pro-inflammatory properties and decreased [] capacity to regulate epithelial integrity and mucosal immunity. Consequently, high dietary sugar can, through the modulation of microbiota, promote metabolic endotoxemia, systemic (low grade) inflammation and the development of metabolic dysregulation and thereby, high dietary sugar may have many-fold deleterious health effects[.]" [37]

**B.      Consuming the Sugar in Metamucil Harms Digestive Health by Impairing Gut Barrier Function**

66. "The gut barrier consists of a specialized, semi-permeable mucosal, and epithelial cell layers that are reinforced by tight junction proteins. Among other functions, this barrier serves to regulate nutrient and water entry and prevents the entry of harmful compounds into extra-luminal tissues" and the blood.[38]

67. When the permeability of the gut or epithelial barrier is increased, this "allows for the influx of adverse substances and may ultimately contribute to the development of metabolic disorders . . . ."[39]

68. "A compromised gut barrier makes the intestinal tract potentially vulnerable to the gram-negative bacteria-derived LPS, which upon excess entry into circulation promotes endotoxemia and systemic inflammation."[40]

69. Both glucose and fructose increase gut barrier permeability.

70. "Although dietary fructose was thought to be metabolized exclusively in the liver, evidence has emerged that it is also metabolized in the small intestine and leads to intestinal epithelial barrier

---

[36] Brown, Diet-Induced Dysbiosis of the Intestinal Microbiota, *supra* n.30.

[37] Satokari, High Intake of Sugar, *supra* n.32.

[38] Noble, E., et al., "Gut to Brain Dysbiosis: Mechanisms Linking Western Diet Consumption, the Microbiome, and Cognitive Impairment," *Front Behav. Neurosci.* 2017, 11:9 (published online January 30, 2017).

[39] *Id.*

[40] *Id.* (Studies have found "elevated plasma levels of a gavaged fluorescent molecule (FITC-dextran) that is typically unable to cross the gut barrier.").

deterioration."[41] A high fructose diet, for example, has been found to result in the "thinning of the intestinal mucosa, epithelium, and muscularis mucosae; loss of crypts and glands" among other harmful effects.[42]

71.   The "increase[d] intestinal permeability," in turn "precedes the development of metabolic endotoxemia, inflammation, and lipid accumulation, ultimately leading to hepatic steatosis and normal-weight obesity." [43]

72.   In addition, "[t]he monosaccharide fructose can escape absorption in the small intestine and reach the microbiota in the distal gut, where microbiota-derived products of fructose metabolism enter the host blood."[44]

73.   Thus, "excessive fructose consumption" has been shown to "result[] in barrier deterioration, dysbiosis, low-grade intestinal inflammation, and endotoxemia."[45]

74.   In short, consuming fructose, like that in the Metamucil Products, has numerous harmful effects on the gut barrier.[46, 47, 48, 49]

---

[41] Febbraio, M., et al., "'Sweet death': Fructose as a metabolic toxin that targets the gut-liver axis," 33(12) *Cell Metab.* 2316-2328 (Dec. 7, 2021) (published online October 6, 2021) [hereinafter "Febbraio, Fructose as a metabolic toxin that targets the gut-liver axis"].

[42] Jian-Mei Li, Dietary fructose-induced gut dysbiosis, *supra* n.33.

[43] Ho Do, High-Glucose or -Fructose Diet Cause Changes of the Gut Microbiota and Metabolic Disorders, *supra* n.33.

[44] Townsend II, Dietary sugar silences a colonization factor, *supra* n.31.

[45] Febbraio, Fructose as a metabolic toxin that targets the gut-liver axis, *supra* n.41.

[46] Satokari, High Intake of Sugar, *supra* n.32 ("consuming high amounts of sugar harms the gut by "increasing small intestinal permeability in healthy humans").

[47] Ho Do, High-Glucose or -Fructose Diet Cause Changes of the Gut Microbiota and Metabolic Disorders, *supra* n.33 ("diet induced changes in the gut microbiota affect the expression of tight junction proteins and inflammatory cytokines, which leads to increased gut permeability and inflammation").

[48] Febbraio, Fructose as a metabolic toxin that targets the gut-liver axis, *supra* n.41 ("fructose, . . . led to the downregulation of enterocyte tight-junction proteins and subsequent barrier deterioration, which is in agreement with previous rodents and human studies (Jin et al., 2014; Kavanagh et al., 2013; Lambertz et al., 2017; Spruss et al., 2012).").

[49] Young-Eun Cho, et al., "Fructose Promotes Leaky Gut, Endotoxemia, and Liver Fibrosis Through Ethanol-Inducible Cytochrome P450-2E1–Mediated Oxidative and Nitrative Stress," 73(6) *Hepatology*, 2180-2195 (April 8, 2019) ("fructose intake causes protein nitration of intestinal [tight-junction] and AJ proteins, resulting in increased gut leakiness, endotoxemia, and steatohepatitis with liver fibrosis").

75.   Like fructose, glucose also harms the gut barrier. For example, both a "[high glucose diet] and [high fructose diet] increased gut permeability and disrupted the gut barrier."[50] This harms the health of the digestive track because "damaged gut barriers" lead to endotoxins crossing the epithelial and into the blood stream, resulting in "higher [blood] plasma endotoxin levels."[51]

76.   Not only does glucose harm the gut barrier from within the digestive track, high levels of glucose in the blood, known as "[h]yperglycemia[,] markedly interfered with homeostatic epithelial integrity, leading to abnormal influx of immune-stimulatory microbial products and a propensity for systemic spread of enteric pathogens."[52] This happens, at least in part, because "hyperglycemia causes retrograde transport of glucose into intestinal epithelial cells via GLUT2, followed by alterations in intracellular glucose metabolism and transcriptional reprogramming."[53]

77.   In short, "experiments establish hyperglycemia as a direct and specific cause for intestinal barrier dysfunction and susceptibility to enteric infection,"[54] such that "[b]lood glucose concentrations are associated with microbial product influx in humans[.]"[55]

78.   Because consuming "[s]ugar has [ ] been shown to irritate the lining of the stomach and intestine," it actually "compromises digestive function and the absorption of nutrients" and can "induce diarrhoea [sic]."[56]

79.   Because consuming the added sugar in Metamucil harms digestive health in multiple ways, P&G's representation that Metamucil "Helps Support: . . . Digestive Health" is false, or at least highly likely

---

[50] Ho Do, High-Glucose or -Fructose Diet Cause Changes of the Gut Microbiota and Metabolic Disorders, *supra* n.33.

[51] *Id.*

[52] Thaiss, C., et al., "Hyperglycemia drives intestinal barrier dysfunction and risk for enteric infection," 359 *Science* (March 23, 2018) ("We have identified glucose as an orchestrator of intestinal barrier function.").

[53] *Id.*

[54] *Id.*

[55] *Id.* (Human studies "suggest that similar to their effects in mice, serum glucose concentrations, rather than obesity, may associate with or potentially even drive intestinal barrier dysfunction in humans.").

[56] DiNicolantonio JJ, Berger A., "Added sugars drive nutrient and energy deficit in obesity: a new paradigm," 3 *Open Heart* 469 (2016).

to mislead reasonable consumers who, without referencing such scientific studies, would not know these claims are deceptive.

**VI.   P&G'S Representations and Omissions are False and Misleading**

80.     As scientific evidence demonstrates, Defendant's "Healthy Blood Sugar Levels," "Heart Health," "Appetite Control," and "Digestive Health" representations are false.

81.     These representations are also misleading, and have the capacity, tendency, and likelihood to confuse or confound Plaintiff and other consumers acting reasonably. This is because the average consumer would believe that the Metamucil Powders provide the represented benefits despite containing added sugar because the average consumer does not know the extent to which consuming the sugar in the Metamucil Powders adversely affects blood sugar levels, appetite control, and/or digestive health.[57]

82.     The average consumer is not intimately familiar with the scientific evidence regarding the health effects of consuming sugar or psyllium fiber. And there is no way for a consumer to know—by simply looking at the label and without reviewing the scientific evidence—whether or not the Metamucil Powders in fact provide the claimed benefits or not.

83.     Therefore, a reasonable consumer is likely to believe that the Metamucil Powders provide the claimed benefits despite their added sugar.

84.     In addition, even if the fiber in the Metamucil Powders is capable of providing some benefits *absent* the large amount of added sugar in the Products, P&G deceptively omits material facts regarding the effects of consuming sugar on blood sugar, appetite control, and digestive health.

85.     Because the Metamucil Powders provide more sugar than fiber, it is deceptive for P&G to market the Metamucil Powders as having benefits associated with consuming fiber, without disclosing the countervailing detriments associated with consuming added sugar—facts that a reasonable consumer would consider material.

---

[57] Below these claims, the Metamucil Powders state that they are made with "Real Sugar." Aside from this statement and attendant changes to the ingredient list and nutrition facts panel, the labeling for P&G's "made with Real Sugar" Metamucil is identical to the labeling of its "Sugar-Free" Metamucil —with both labels promising identical health benefits. Consumers thus reasonably believe the products are equally healthful, despite their different added sugar content.

86.     Additionally, it is unfair and deceptive for P&G to advise consumers to ingest up to six rounded teaspoons or tablespoons (depending on variety) of the Metamucil Powders, when doing so would cause many consumers to exceed the daily added sugar intake levels recommended by authoritative health bodies to prevent harm to health.

87.     While representing that the Metamucil Powders help support healthy blood sugar levels, appetite control, and digestive health, P&G regularly and intentionally omits material information regarding the countervailing detrimental effects of the added sugars in the Metamucil Powders on blood sugar levels, appetite control, and digestive health.

88.     P&G is under a duty to disclose this information to consumers because it is revealing some information about the Metamucil Powders—enough to suggest they help support healthy blood sugar levels, appetite control, and digestive health—without revealing directly relevant information regarding the harmful effects of added sugar on blood sugar levels, appetite control, and digestive health.

89.     P&G is under a duty to disclose this information because its deceptive omissions concern human health and safety, specifically the detrimental health consequences of consuming the Products.

90.     P&G is under a duty to disclose this information because it was in a superior position to know of the dangers presented by the sugars in the Metamucil Powders, as it is a large, sophisticated company that holds itself out as having expert knowledge regarding the impact of consuming Metamucil Powders.

91.     P&G is under a duty to disclose this information because it actively concealed material facts not known to Plaintiff and the Class.

**VII.    The Metamucil Powders' Labeling Violates California and Federal Law**

92.     For the purposes of labeling, "a dietary supplement shall be deemed to be a food." *See* 21 U.S.C. § 321(ff).

93.     The Metamucil Powders and their challenged labeling statements violate California Health and Safety Code §§109875, *et. seq.* (the "Sherman Law"), which has expressly adopted the federal food labeling requirements as its own. *See, e.g., id.* § 110100; *id.* § 110670 ("Any food is misbranded if its

labeling does not conform with the requirements for nutrition labeling as set forth in Section 403(r) (21 U.S.C. Sec. 343(r)) of the federal act and the regulation adopted pursuant thereto.").

94.     First, the challenged claims are false and misleading for the reasons described herein, in violation of 21 U.S.C. § 343(a), which deems misbranded any food whose "label is false or misleading in any particular." P&G accordingly also violated California's parallel provision of the Sherman Law. *See* Cal. Health & Safety Code § 110670.

95.     Second, despite making the challenged claim, P&G "fail[ed] to reveal facts that are material in light of other representations made or suggested by the statement[s], word[s], design[s], device[s], or any combination thereof," in violation of 21 C.F.R. § 1.21(a)(1). Such facts include the detrimental health consequences of consuming the Metamucil Powders at typical levels, including "Healthy Blood Sugar Levels," "Appetite Control," and "Digestive Health." In addition, such facts include the detrimental health consequences of consuming the Metamucil Powders at typical levels including increased risk of metabolic disease, cardiovascular disease, type 2 diabetes, liver disease, obesity, high blood triglycerides and cholesterol, hypertension, and death, which would be material to a consumer choosing a dietary supplement.

96.     Third, P&G failed to reveal facts that were "[m]aterial with respect to the consequences which may result from use of the article under" both "[t]he conditions prescribed in such labeling," and "such conditions of use as are customary or usual," in violation of § 1.21(a)(2). P&G failed to disclose both (1) the increased risk of serious chronic disease and death that is likely to result from the usual consumption of the Metamucil Powders in the customary and prescribed manners, including regular consumption of the standard serving size and (2) the detrimental health consequences of consuming the Metamucil Powders at typical levels on "Blood Sugar Levels," "Appetite Control," and "Digestive Health."

## VIII.   PLAINTIFF'S PURCHASE, RELIANCE, AND INJURY

97.     As best she can recall, Plaintiff Tara Amato purchased orange flavored Metamucil during the Class Period starting, approximately, in late 2017 or early 2018. Ms. Amato would often make her purchases from stores such as CVS, Target, and Walgreens in San Bruno, California.

98.     When purchasing the Metamucil Powders, Plaintiff was seeking a fiber supplement that would provide benefits related to healthy blood sugar levels, heart health, appetite control, and digestive

health as represented on the Metamucil Powders' labeling. In purchasing Metamucil, Plaintiff was exposed to, read, and relied on P&G's representations that its consumption would promote appetite control, healthy blood sugar levels, heart health, and digestive health, which communicated to her that it would provide these benefits and was generally healthy to consume and would not detriment her overall health with regular consumption. These claims, however, were and are deceptive because the Metamucil Powders actually decrease appetite control, harm blood sugar levels, and damage digestive health.

99.     Plaintiff is not a nutritionist, food expert, or food scientist, but rather a lay consumer who did not have the specialized knowledge that P&G had regarding the impact of the nutrients present in the Metamucil Powders. At the time of purchase, Plaintiff was unaware of the extent to which consuming added sugar in the amounts found in the Metamucil Powders adversely affects blood sugar levels, heart health and cholesterol levels, digestive health, appetite control, and overall health, and what amount might have such an adverse effect.

100.    Plaintiff acted reasonably in relying on the challenged labeling claims, which P&G intentionally placed on the Metamucil Powders' labeling with the intent to induce average consumers into purchasing the Products.

101.    Plaintiff would not have purchased the Metamucil Powders if she knew that the challenged claims were false and misleading in that the Metamucil Powders do not provide any of the claimed benefits, meaning, healthy blood sugar levels, heart health, appetite control, or digestive health, and are not beneficial to health.

102.    The Metamucil Powders cost more than similar products without misleading labeling and would have cost less absent P&G's false and misleading statements and omissions.

103.    Through the misleading labeling claims and omissions, P&G was able to gain a greater share of the fiber supplement market than it would have otherwise and to increase the size of the market.

104.    Plaintiff paid more for the Metamucil Powders, and would only have been willing to pay less, or unwilling to purchase them at all, absent the false and misleading labeling complained of herein.

105.    Plaintiff would not have purchased the Metamucil Powders if she had known that the products were misbranded pursuant to California and FDA regulations, or that the challenged claims were false or misleading.

106.    For these reasons, the Metamucil Powders were worth less than what Plaintiff and the Class paid for them.

107.    Instead of receiving products that had actual healthful qualities, the Metamucil Powders that Plaintiff and the Class received were likely to lead to increased risk of disease when consumed regularly.

108.    Plaintiff and the Class lost money as a result of P&G's deceptive claims, omissions, and practices in that they did not receive what they paid for when purchasing the Metamucil Powders.

109.    Plaintiff still wishes to purchase healthy fiber supplements and continues to see the Metamucil Powders at stores when she shops. She would purchase Metamucil Powders in the future if the products were beneficial to health and provided the specific health benefits represented. But unless P&G is enjoined in the manner Plaintiff requests, she may not be able to reasonably determine whether the Metamucil Powders have been reformulated so that they are now beneficial to health or provide the promised health benefits. For example, although the type and amount of fiber in the Metamucil Powders is currently insufficient to counteract the negative health consequences of their added sugar content, changes to the composition, processing, and manufacturing of the Metamucil Powders, not evident upon examination of the product labels, could change its effect on the body.

110.    Plaintiff would purchase the Metamucil Powders if she could trust that P&G's representations were true and not false or misleading, but absent an injunction, Plaintiff will be unable to trust the representations on the Metamucil Powders when she encounters them in the marketplace.

111.    Plaintiff's substantive right to a marketplace free of fraud, where she is entitled to rely with confidence on representations such as those made by P&G, continues to be violated every time Plaintiff is exposed to the misleading labeling claims.

112.    Plaintiff's legal remedies are inadequate to prevent these future injuries.

**CLASS ACTION ALLEGATIONS**

113.    While reserving the right to redefine or amend the class definition prior to or as part of a motion seeking class certification, pursuant to Federal Rule of Civil Procedure 23, Plaintiff seeks to represent a class of all persons in the United States, or alternatively in California, who, at any time from four years preceding the date of the filing of this Complaint to the time a class is notified (the "Class Period"), purchased, for personal or household use, and not for resale or distribution, any of the Metamucil Powders (the "Class").

114.    The members in the proposed Class are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of all Class Members in a single action will provide substantial benefits to the parties and Court.

115.    Questions of law and fact common to Plaintiff and the Class include:

        a.    whether the challenged statements on the Metamucil Powders are material, or likely to be material, to a reasonable consumer;

        b.    whether the challenged claims are false, misleading, or reasonably likely to deceive a reasonable consumer;

        c.    whether P&G's conduct violates public policy;

        d.    whether P&G's conduct violates state or federal food statutes or regulations;

        e.    whether P&G made and breached warranties;

        f.    the proper amount of damages, including punitive damages;

        g.    the proper amount of restitution;

        h.    the proper scope of injunctive relief; and

        i.    the proper amount of attorneys' fees.

116.    These common questions of law and fact predominate over questions that affect only individual Class Members.

117.    Plaintiff's claims are typical of Class Members' claims because they are based on the same underlying facts, events, and circumstances relating to P&G's conduct. Specifically, all Class Members, including Plaintiff, were subjected to the same misleading and deceptive conduct when they purchased the

Metacmucil Powders and suffered economic injury because the products are misrepresented. Absent P&G's business practice of deceptively and unlawfully labeling the Metacmucil Powders, Plaintiff and Class Members would not have purchased them or would have paid less for them.

118. Plaintiff will fairly and adequately represent and protect the interests of the Class, has no interests incompatible with the interests of the Class, and has retained counsel competent and experienced in class action litigation, and specifically in litigation involving the false and misleading advertising of foods and beverages.

119. Class treatment is superior to other options for resolution of the controversy because the relief sought for each Class Member is small, such that, absent representative litigation, it would be infeasible for Class Members to redress the wrongs done to them.

120. P&G has acted on grounds applicable to the Class, thereby making appropriate final injunctive and declaratory relief concerning the Class as a whole.

121. As a result of the foregoing, class treatment is appropriate under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3).

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Violations of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*

122. Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

123. The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

124. The acts, omissions, misrepresentations, practices, and non-disclosures of as alleged herein constitute business acts and practices.

### Fraudulent

125. A statement or practice is fraudulent under the UCL if it is likely to deceive a significant portion of the public, applying an objective reasonable consumer test.

126.    As set forth herein, P&G's "Appetite Control," "Blood Sugar," "Digestive Health," and "#1 Doctor Recommended" representations relating to the Metamucil Powders are likely to deceive reasonable consumers and the public.

### Unlawful

127.    As set forth herein, P&G's "Appetite Control," "Blood Sugar," "Digestive Health," and "#1 Doctor Recommended" representations relating to the Metamucil Powders are "unlawful" under the UCL in that they violate at least the following laws:

- • The False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*;

- • The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*;

- • The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.*; and

- • The California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code §§ 110100 *et seq*.

### Unfair

128.    P&G's conduct with respect to the labeling, advertising, and sale of the Metamucil Powders with "Appetite Control," "Blood Sugar," "Digestive Health," and "#1 Doctor Recommended" representations was unfair because P&G's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers, and the utility of its conduct, if any, does not outweigh the gravity of the harm to its victims.

129.    P&G's conduct with respect to the labeling, advertising, and sale of the Metamucil Powders with "Appetite Control," "Blood Sugar," "Digestive Health," and "#1 Doctor Recommended" representations was also unfair because it violates public policy as declared by specific constitutional, statutory or regulatory provisions, including but not necessarily limited to the False Advertising Law, portions of the Federal Food, Drug, and Cosmetic Act, and portions of the California Sherman Food, Drug, and Cosmetic Law.

130.    P&G's conduct with respect to the labeling, advertising, and sale of the Metamucil Powders with "Appetite Control," "Blood Sugar," "Digestive Health," and "#1 Doctor Recommended" representations was and is also unfair because the consumer injury was substantial, not outweighed by

benefits to consumers or competition, and not one consumers themselves could reasonably have avoided. Specifically, the increase in profits obtained by P&G through the misleading labeling does not outweigh the harm to Class Members who were deceived into purchasing the Metamucil Powders believing they provide the claimed benefits when in fact they do not provide the claimed benefits and are of the type that is likely to detriment health. Consumers could not have reasonably avoided the harm because this would have required that they conduct their own research into the health effects of consuming the Metamucil Powders, which is not a reasonable expectation. Further, the harm could have easily been avoided by P&G as it would have cost them nothing to not place the challenged claims on the Products' labels.

131.    P&G profited from the sale of the falsely, deceptively, and unlawfully advertised the Metamucil Powders to unwary consumers.

132.    Plaintiff and Class Members are likely to continue to be damaged by P&G's deceptive trade practices, because P&G continues to disseminate misleading information. Thus, injunctive relief enjoining P&G's deceptive practices is proper.

133.    P&G's conduct caused and continues to cause substantial injury to Plaintiff and other Class Members. Plaintiff has suffered injury in fact as a result of P&G's unlawful conduct.

134.    In accordance with Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining P&G from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices.

135.    Plaintiff and the Class also seek an order for the restitution of all monies from the sale of the Metamucil Powders, which were unjustly acquired through acts of unlawful competition.

136.    Because Plaintiff's claims under the "unfair" prong of the UCL sweep more broadly than their claims under the FAL, CLRA, or UCL's "fraudulent" prong, Plaintiff's legal remedies are inadequate to fully compensate Plaintiff for all of P&G's challenged behavior.

## SECOND CAUSE OF ACTION

### Violations of the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*

137.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

138.   The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

139.   It is also unlawful under the FAL to disseminate statements concerning property or services that are "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id*.

140.   As alleged herein, the advertisements, labeling, policies, acts, and practices of P&G relating to the Metamucil Powders were likely to mislead consumers acting reasonably, as to the effects of consuming the Products on appetite control, blood sugar, and digestive health.

141.   Plaintiff suffered injury in fact as a result of P&G's actions as set forth herein because Plaintiff purchased the Metamucil Powders in reliance on P&G's false and misleading marketing claims stating or suggesting that the Metamucil Powders help support healthy blood sugar levels, appetite control, digestive health, and are doctor recommended.

142.   P&G's business practices as alleged herein constitute unfair, deceptive, untrue, and misleading advertising pursuant to the FAL because P&G has advertised the Metamucil Powders in a manner that is untrue and misleading, which P&G knew or reasonably should have known, and omitted material information from the Metamucil Powders' labeling.

143.   P&G profited from the sale of the falsely and deceptively advertised the Metamucil Powders to unwary consumers.

144.   As a result, Plaintiff, the Class, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which P&G was unjustly enriched.

145.   Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiff, on behalf of herself and the Class, seek an order enjoining P&G from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth in this Complaint.

146.    Because the Court has broad discretion to award restitution under the FAL and could, when assessing restitution under the FAL, apply a standard different than that applied to assessing damages under the CLRA or commercial code (for Plaintiff's breach of warranty claims), and restitution is not limited to returning to Plaintiff and class members monies in which they have an interest, but more broadly serves to deter the offender and others from future violations, the legal remedies available under the CLRA and commercial code are more limited than the equitable remedies available under the FAL, and are therefore inadequate.

## THIRD CAUSE OF ACTION

### Violations of the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*

147.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

148.    The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

149.    P&G's false and misleading labeling and other policies, acts, and practices were designed to, and did, induce the purchase and use of the Metamucil Powders for personal, family, or household purposes by Plaintiff and Class Members, and violated and continue to violate the following sections of the CLRA:

150.    § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

151.    § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another;

152.    § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

153.    § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

154.    P&G profited from the sale of the falsely, deceptively, and unlawfully advertised Metamucil Powders to unwary consumers.

155.    P&G's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA.

156.     Pursuant to California Civil Code § 1782, more than 30 days before filing this lawsuit, Plaintiff sent written notice of their claims and P&G's particular violations of the Act to P&G by certified mail, return receipt requested, but P&G has failed to implement remedial measures.

157.     As a result, Plaintiff and the Class have suffered harm, and therefore seek (a) actual damages resulting from purchases of the Metamucil Powders sold throughout the Class Period to all Class Members, (b) punitive damages, (c) injunctive relief in the form of modified advertising, (d) restitution, and (e) attorneys' fees and costs.  *See* Cal. Civ. Code § 1782(d).

158.     In compliance with Cal. Civ. Code § 1780(d), an affidavit of venue is filed concurrently herewith.

## FOURTH CAUSE OF ACTION

## Breaches of Express Warranties, Cal. Com. Code § 2313(1)

159.     Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

160.     Through the Metamucil Powders' labeling, P&G made affirmations of fact or promises, or description of goods, that, *inter alia*, the products are beneficial to health and are doctor recommended, and provide the specific health benefits of helping support appetite control, heart health, healthy blood sugar levels, and digestive health.

161.     These affirmations and descriptions include: "Helps Support: Appetite Control[,] Heart Health by Lowering Cholesterol[,]  Healthy Blood Sugar Levels[, and] Digestive Health," and "#1 Doctor Recommended Brand."

162.     These representations were "part of the basis of the bargain," in that Plaintiff and the Class purchased the Metamucil Powders in reasonable reliance on those statements. Cal. Com. Code § 2313(1).

163.     P&G breached its express warranties by selling Metamucil Powders that that do not meet the above affirmations, promises, and product descriptions because consumption of the Metamucil Powders is likely to adversely affect appetite control, heart health and cholesterol levels, blood sugar levels, and digestive health, and is overall detrimental rather than beneficial to health.

164.    That breach actually and proximately caused injury in the form of the lost purchase price that Plaintiff and Class Members paid for the Metamucil Powders.

165.    As a result, Plaintiff seeks, on behalf of herself and other Class Members, their actual damages arising as a result of P&G's breaches of express warranty, including, without limitation, expectation damages.

**FIFTH CAUSE OF ACTION**

**Breach of Implied Warranty of Merchantability, Cal. Com. Code § 2314**

166.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

167.    P&G, through its acts set forth herein, in the sale, marketing, and promotion of the Metamucil Powders, made representations to Plaintiff and the Class that, among other things, the Metamucil Powders are beneficial to health and are doctor recommended, and provide the specific health benefits of helping support appetite control, heart health, healthy blood sugar levels, and digestive health.

168.    P&G is a merchant with respect to the goods of this kind which were sold to Plaintiff and the Class, and there were, in the sale to Plaintiff and the Class, implied warranties that those goods were merchantable.

169.    However, P&G breached that implied warranty in that the Metamucil Powders are not beneficial to health but are of the type that are generally harmful to health, as set forth in detail herein.

170.    As an actual and proximate result of P&G's conduct, Plaintiff and the Class did not receive goods as impliedly warranted by P&G to be merchantable in that they did not conform to promises and affirmations made on the container or label of the goods.

171.    As a result, Plaintiff seeks actual damages, including, without limitation, expectation damages

**<u>PRAYER FOR RELIEF</u>**

172.    Wherefore, Plaintiff, on behalf of herself, all others similarly situated, and the general public, pray for judgment against P&G as to each and every cause of action, and the following remedies:

a.   An Order declaring this action to be a proper class action, appointing Plaintiff as Class Representative, and appointing Plaintiff's undersigned counsel as Class Counsel;

b.   An Order requiring P&G to bear the cost of Class Notice;

c.   An Order compelling P&G to destroy all misleading and deceptive advertising materials and product labels, and to recall all offending products;

d.   An Order requiring P&G to disgorge all monies, revenues, and profits obtained by means of any wrongful act or practice;

e.   An Order requiring P&G to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, or untrue or misleading advertising, plus pre-and post-judgment interest thereon;

f.   An Order requiring P&G to pay compensatory damages and punitive damages as permitted by law;

g.   An award of attorneys' fees and costs; and

h.   Any other and further relief that Court deems necessary, just, or proper.

## **JURY DEMAND**

173.   Plaintiff hereby demands a trial by jury on all issues so triable.


Dated: September 22, 2022                    /s/ Paul K. Joseph
                                             **FITZGERALD JOSEPH LLP**
                                             JACK FITZGERALD
                                             *jack@fitzgeraldjoseph.com*
                                             PAUL K. JOSEPH
                                             *paul@fitzgeraldjoseph.com*
                                             MELANIE PERSINGER
                                             *melanie@fitzgeraldjoseph.com*
                                             TREVOR M. FLYNN
                                             *trevor@fitzgeraldjoseph.com*
                                             CAROLINE S. EMHARDT
                                             *caroline@fitzgeraldjoseph.com*
                                             2341 Jefferson Street, Suite 200
                                             San Diego, California 92110

1

Phone: (619) 215-1741

***Counsel for Plaintiff***

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

33