**FITZGERALD JOSEPH LLP**
JACK FITZGERALD (SBN 257370)
*jack@fitzgeraldjoseph.com*
PAUL K. JOSEPH (SBN 287057)
*paul@fitzgeraldjoseph.com*
MELANIE PERSINGER (SBN 275423)
*melanie@fitzgeraldjoseph.com*
TREVOR M. FLYNN (SBN 253362)
*trevor@fitzgeraldjoseph.com*
CAROLINE S. EMHARDT (SBN 321222)
*caroline@fitzgeraldjoseph.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741
***Counsel for Plaintiff***

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Tara Amado, on behalf of herself, all others similarly situated, and the general public,<br><br>Plaintiff,<br><br>v.<br><br>The Procter & Gamble Co.,<br><br>Defendant. | Case No.: 22-cv-5427-MMC<br><br><u>CLASS ACTION</u><br><br>**FIRST AMENDED COMPLAINT FOR CONSUMER FRAUD, BREACH OF EXPRESS & IMPLIED WARRANTIES, NEGLIGENT AND INTENTIONAL MIREPRESENTATION, AND UNJUST ENRICHMENT**<br><br>Judge: Hon. Maxine M. Chesney<br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Tara Amado, on behalf of herself, all others similarly situated, and the general public, by and through her undersigned counsel, hereby sues The Procter & Gamble Co. ("P&G"), and alleges the following upon her own knowledge, or where she lacks personal knowledge, upon information and belief, including the investigation of her counsel.

## INTRODUCTION

1.      P&G sells Metamucil, a psyllium fiber powder, that it claims helps support "Healthy Blood Sugar Levels," "Appetite Control," and "Digestive Health."

2.      P&G's "Appetite Control," "Blood Sugar," and "Digestive Health" representations are false or at least highly misleading because compelling scientific evidence demonstrates that the Metamucil Powders—due to their added sugar content—actually decrease appetite control, harm blood sugar levels, and damage digestive health.

3.      Plaintiff brings this action against P&G on behalf of herself, similarly situated Class Members, and the general public to enjoin P&G from deceptively marketing the Metamucil Powders, and to recover compensation for injured Class Members.

## JURISDICTION & VENUE

4.      This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d)(2) (The Class Action Fairness Act) because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a state different from P&G. In addition, more than two-thirds of the members of the class reside in states other than the state in which P&G is a citizen and in which this case is filed, and therefore any exceptions to jurisdiction under 28 U.S.C. § 1332(d) do not apply.

5.      The Court has personal jurisdiction over P&G as a result of P&G's substantial, continuous and systematic contacts with the State, and because P&G has purposely availed itself of the benefits and privileges of conducting business activities within the State, including by marketing, distributing, and selling the Metamucil Powders in California.

6.      Venue is proper in this Northern District of California pursuant to 28 U.S.C. § 1391(b) and (c), because P&G resides (*i.e.*, is subject to personal jurisdiction) in this district, and because a substantial

part of the events or omissions giving rise to the claims occurred in this district.

**DIVISIONAL ASSIGNMENT**

7.       This civil action arises out of the acts and omissions of P&G, which occurred in San Mateo County. Pursuant to Civil Local Rule 3-2(c) and (d), this action is correctly assigned to the San Francisco or Oakland Division.

**PARTIES**

8.       Plaintiff Tara Amado is a citizen of California.

9.       Defendant P&G is an Ohio corporation with its principal place of business in Cincinnati, Ohio.

**FACTS**

I.       **P&G Markets the Metamucil Powders as Helping to Support Healthy Blood Sugar Levels, Appetite Control, and Digestive Health**

10.       P&G sells a variety of products under the Metamucil brand name, including psyllium fiber powder to which it adds large amounts of sugar (the "Metamucil Powders" or "Products").[1]

11.       On the front of the Metamucil Powder labels, P&G represents that they help support "Appetite Control," "Healthy Blood Sugar Levels," and "Digestive Health."[2]

12.       To reinforce the message that the Metamucil Powders are effective in providing these benefits, P&G also labels the Metamucil Products with a circular symbol that states "#1 Doctor Recommended Brand."

---

[1] The Metamucil Powders challenged in this lawsuit include those varieties of Metamucil that contain added sugar, namely Metamucil's Unflavored and Orange Flavored Fiber Powders.

[2]       P&G also represents that each Metamucil Powder "Helps Support: . . . Heart Health by Lowering Cholesterol Levels," but that claim is no longer a basis for Plaintiff's causes of action. Nevertheless she maintains that the scientific literature demonstrates that consumption of sugar-sweetened beverages harm and detriment heart health and cholesterol levels. *See, e.g.*, Yang, Quanhe, et al., "Added Sugar Intake and Cardiovascular Diseases Mortality Among US Adults," *JAMA*, at E4-5 (pub. online, Feb. 3, 2014); Fung, T.T., et al., "Sweetened beverage consumption and risk of coronary heart disease in women." 89 *Am. J. Clin. Nutr.* 1037-42 (Feb. 2009); Dhingra, R., et al., "Soft Drink Consumption and Risk of Developing Cardiometabolic Risk Factors and the Metabolic Syndrome in Middle-Aged Adults in the Community," 116 Circulation 480-88 (2007); Welsh, J.A., et al., "Caloric Sweetener Consumption and Dyslipidemia Among US Adults," 303(15) *J. Am. Med. Assoc'n*, Vol. 303, No. 15, 1490-97 (April 21, 2010).

1

**Orange Metamucil Powder**




13.     P&G's "Appetite Control," "Blood Sugar," and "Digestive Health" representations are important to consumers, who, absent believing the Metamucil Powders provide the claimed benefits, would have no reason to buy the Metamucil Powders.

14.     The "Doctor Recommended" representation is also important to Metamucil consumers, as it reinforces and lends credibility to the message that the Metamucil Powders are effective at providing the claimed benefits and are backed by scientific evidence because a reasonable consumer would assume doctors would not recommend a product otherwise.

3

15.     As a sophisticated marketing company, P&G knows using the statement "#1 Doctor Recommended Brand" on the Metamucil Powders "not only adds credibility to [the] brand, but also drives consumers to act."[3] Indeed, "82% of consumers say this claim is highly influential in their purchase decisions."[4] By touting the Metamucil Powders as the "#1 Doctor Recommended Brand," P&G is telling consumers they "can trust" the Products to provide the claimed benefits:



16.     P&G's use of the "#1 Doctor Recommended Brand" statement in advertisements on its YouTube channel further demonstrates it intended the statement to reinforce and inspire trust in the supposed health benefits of the Metamucil Powders. In one advertisement, for example, Metamucil claims that "not all fibers are the same," and that due to Metamucil's supposed ability to "improv[e] regularity," "Metamucil is different," and so "[i]t's no wonder Metamucil is the number one doctor recommended fiber

---

[3] Linda Ruschau, "Why Your OTC Brand Should be Messaging in the Doctor's Office," Patient Point (Oct. 12, 2022), https://www.patientpoint.com/blog/otc-brand-messaging-doctor-office (mentioning "an esteemed panel of consumer health marketers and data experts" that included "Tom Finn, Retired President, Global Personal Health Care at Procter & Gamble" that discussed "success they have had in gaining the coveted '#1 Doctor Recommended' claim").

[4] *Id.*

brand and has been trusted by healthcare professionals for over 80 years."[5]

17.     On the back of the label, P&G instructs consumers, identified as adults 12 years and older, on "How to Take Metamucil." For example, on P&G's orange flavored Metamucil Powder, it tells consumers that for "Digestive Health" and "Healthy Blood Sugar Levels" they should take "1 Rounded Tablespoon up to 3 times per day," and for "Appetite Control," take "2 Rounded Tablespoons up to 3 times per day."

18.     Following the appetite control instructions for the unflavored and orange flavored Metamucil Powders, for example, would lead a consumer to drink up to 21g and 48g of added sugar per day, respectively.

19.     Like the "#1 Doctor Recommended Brand" statement, these instructions reinforce the message that the Metamucil Powders effectively support "Digestive Health," "Healthy Blood Sugar Levels," and "Appetite Control."

---

[5] *See* https://www.youtube.com/watch?v=5lgF99xqSm4. Although Plaintiff only challenges the claims that appear on the label of the Metamucil Powders, P&G's off-label and other marketing provides context.

1    **Orange Metamucil Powder**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18





19        20.    Based on the challenged claims, individually and especially in combination, the average

20    consumer would reasonably expect that adding the Metamucil Powders to their diet "Helps Support:

21    Appetite Control[,] . . . Healthy Blood Sugar Levels [and] Digestive Health" as P&G represents.

22        21.    Because of these representations, the average consumer would not expect that consuming the

23    Metamucil Powders as instructed would actually decrease appetite control, harm blood sugar levels, and

24    damage digestive health.

25        22.    Further, the average consumer is unaware that strong scientific evidence demonstrates

26    consuming the amount of sugar in the Metamucil Powders, as instructed, would actually decrease appetite

27    control, harm blood sugar levels, and damage digestive health.

28

23.     P&G's claims, therefore, are both false and misleading to the reasonable consumer.

**II.    Scientific Studies Demonstrate that P&G's Representation that Metamucil Helps Support Healthy Blood Sugar Levels is False and Misleading**

24.     On the Metamucil Powders' labeling, P&G represents that it "Helps Support: . . . Healthy Blood Sugar Levels" and instructs consumers that, for "Healthy Blood Sugar Levels," "before each meal" they should take "1 Rounded Teaspoon" of unflavored and "1 Rounded Tablespoon" of orange flavored Metamucil "up to 3 times per day."

25.     P&G knows its "Healthy Blood Sugar Levels" representations are important to reasonable consumers. On its website, for example, it states that "Healthy Blood Sugar Levels [are] Important" because "[o]ver time regularly eating large amounts of simple processed sugars can impact your body's ability to maintain healthy blood sugar levels" and "[i]f your blood sugar levels are consistently elevated, you could be diagnosed with prediabetes."[6]

26.     But P&G's blood sugar labeling claims are false or at least highly misleading because following P&G's instructions leads to the consumption of amounts of sugar that the average consumer is unaware causes unhealthy fluctuations in blood sugar levels and, over time, these fluctuations can cause the body to be unable to control blood sugar levels due to insulin resistance, type 2 diabetes, and/or metabolic syndrome.

27.     For example, following P&G's instructions of taking "2 Rounded Tablespoons up to three times per day," leads to the consumption of 192 extra calories from added sugar. And as one scientific analysis showed, an increase of 150 calories per day in sugar related to a 1.1% rise in diabetes prevalence by country, a statistically-significant increase of 11-fold.[7]

28.     There are many other scientific studies, of which the average consumer is unaware, demonstrating that consuming drinks with added sugar directly harms blood sugar levels.

---

[6]  Procter & Gamble, "How Psyllium Maintain Healthy Blood Sugar Levels | Metamucil," at https://www.metamucil.com/en-us/articles/psyllium-fiber/how-psyllium-fiber-can-help-maintain-healthy-blood-sugar [hereinafter "P&G, Healthy Blood Sugar Levels"].

[7]  Basu, S., et al., "The Relationship of Sugar to Population-Level Diabetes Prevalence: An Econometric Analysis of Repeated Cross-Sectional Data," 8(2) *PLOS Online* 1-8 (Feb. 27, 2013).

29.    One large meta-analysis that included data from 34,748 adults found that, "after adjustment for age, sex, energy intake, BMI and other dietary covariates, each additional serving of [sugar sweetened beverage] intake was associated with higher *fasting* glucose"[8] blood levels, which is unhealthy.

30.    This in turn leads to "higher fasting insulin"[9] levels, which can cause insulin resistance. In fact, studies have shown that "Regular SSB [sugar-sweetened beverage] intake . . . is associated with a greater increase in insulin resistance and a higher risk of developing prediabetes in a group of middle-aged adults."[10]

31.    Another study "aimed to evaluate the relationship between the consumption of selected food groups and insulin resistance, with an emphasis on sugar-sweetened beverages (SSB)," and found that "daily consumption of SSB was related with increased [homeostasis model assessment-insulin resistance] in adolescents."[11]

32.    Yet another study examining "the association between sugar-sweetened beverage (SSB) consumption with biomarkers of insulin resistance (IR)" found that "[a]dolescents who consumed a greater amount of SSBs were more likely to have elevated fasting serum insulin[.] "[12]

33.    Another study found that "SSB supplementation led to a significant increase in fasting plasma glucose and a strong trend towards a reduction in insulin sensitivity in healthy lean individuals with low physical activity, who otherwise consumed less than 500 mL SSB per week."[13]

---

[8] McKeown, N.M. et al., "Sugar-Sweetened Beverage Intake Associations with Fasting Glucose and Insulin Concentrations Are Not Modified by Selected Genetic Variants in a ChREBP-FGF21 Pathway: A Meta-Analysis," 61 *Diabetologia* 317–30 (2018) (emphasis added).

[9] *Id.*

[10] Ma, J. et al., "Sugar-Sweetened Beverage but Not Diet Soda Consumption Is Positively Associated with Progression of Insulin Resistance and Prediabetes," 146 *J. Nutr.* 2544-50 (2016).

[11] Kondaki, K. et al., "Daily Sugar-Sweetened Beverage Consumption and Insulin Resistance in European Adolescents," 16 *Public Health Nutr.* 479-86 (2013).

[12] Lin, W.-T. et al., "Fructose-Rich Beverage Intake and Central Adiposity, Uric Acid, and Pediatric Insulin Resistance," 171 *J. Pediatr.* 90–96 (2016).

[13] Sartor F et al., "Adaptive metabolic response to 4 weeks of sugar-sweetened beverage consumption in healthy, lightly active individuals and chronic high glucose availability in primary human myotubes." 52(3) *Euro. J. Nutr.* 937-48 (Apr. 2013). *See also* Teshima N et al., "Effects of sugar-sweetened beverage intake

34.     In short, there is "a clear link between [sugar sweetened beverage] consumption," like the Metamucil Powders challenged here, "and risk of . . . type 2 diabetes."[14] This means consuming the Metamucil Powders causes unhealthy rises and fluctuations in blood sugar levels, which, with time, will increase one's risk of becoming diabetic or prediabetic and at which point the body loses its ability to regulate or maintain healthy blood sugar levels. Thus, rather than helping to support healthy blood sugar levels, regularly taking Metamucil as directed will contribute to unhealthy blood sugar levels in the long term.

35.     Not only does the large amount of free sugar that P&G adds to the Metamucil Powders lead to unhealthy blood sugar levels, studies show that the fiber in the Metamucil Powders does not help control blood sugar levels or blunt the harmful effect of the sugar in the Metamucil Powders. Specifically, one controlled, randomized clinical study shows that when one consumes sugar, the fiber in the Metamucil Powders does not improve or help control blood sugar levels.[15]

36.     In that study, researchers specifically tested "[t]he effects of incorporating Fybogel (3.5 and 7g doses), **Metamucil** (7g)[,] or guar gum (2.5 and 14.5g doses) in a drink containing 50g glucose on plasma glucose [and] plasma insulin."[16] While "[b]oth doses of guar gum significantly lowered plasma glucose and plasma insulin responses to the oral glucose load . . . . *Neither Fybogel nor Metamucil had significant effects on plasma glucose responses*."[17]

---

on the development of type 2 diabetes mellitus in subjects with impaired glucose tolerance: the Mihama diabetes prevention study." 61(1) J. *Nutr. Sci. Vitaminol*. 14-19 (2015) ("SSB intake correlated with the predisposition for developing T2DM, possibly by influencing body weight, insulin resistance, and the ability of the pancreatic beta cells to effectively compensate for the insulin resistance").

[14] Malik, Vasanti S., et al., "Sugar-Sweetened Beverages and Risk of Metabolic Syndrome and Type 2 Diabetes," 33(11) *Diabetes Care*, 2477-83, at 2477, 2480-81 (November 2010) [hereinafter "Malik, 2010 Meta-Analysis"].

[15] H.A. Jarjis et al., "The effect of ispaghula (Fybogel and Metamucil) and guar gum on glucose tolerance in man," 51 *British J. Nutr*. 371-378 (1984).

[16] *Id.*

[17] *Id.* (emphasis added).

37.     As seen below in Figure 2, the "[a]ddition of 7 g Metamucil to an oral glucose load of 50 g glucose in 250 ml of solution produced *no [statistically] significant change in postprandial glucose levels* (Fig. 2)."



Fig. 2. Increase in plasma glucose levels (mm) over basal values following ingestion of 50 g glucose in a 250 ml drink (●) with or (○) without 7 g Metamucil in normal subjects. Points are mean values with their standard errors of the mean represented by vertical bars for eight observations.

38.     Other studies confirm that soluble fiber from psyllium—such as that in Metamucil—does not improve or support healthy blood sugar levels as P&G claims. One study found that "less viscous soluble fiber sources such as the pectins and psyllium powder are not effective" for "management of the plasma glucose concentration in individuals with diabetes" and are "of little or no value in controlling the plasma glucose concentration in individuals with NIDDM."[18]

39.     In short, consuming the high-sugar Metamucil Powders results in unhealthy changes in blood sugar levels and the inability to maintain healthy blood sugar levels. Thus, P&G's claim that Metamucil "Helps Support: . . . Healthy Blood Sugar Levels" is false. These representations are not only false but likely

---

[18] Nuttall, F., "Perspectives in Diabetes - Dietary Fiber in the Management of Diabetes," 42 *Diabetes* 503-508 (April 1993).

to mislead reasonable consumers who, without referencing such scientific studies, would not know these claims are false.

## III. Scientific Studies Demonstrate that P&G's Representation that Metamucil Helps Support Appetite Control is False and Misleading

40.    P&G advises consumers that for "Appetite Control[] take before each meal," "2 Rounded Teaspoons" of unflavored and "2 Rounded Tablespoons" of orange flavored Metamucil "up to 3 times per day." Following P&G's instructions for "Appetite Control" results in consuming up to 21g and 48g of added sugar, respectively.

41.    But the scientific evidence demonstrates that sugar-sweetened beverage consumption is associated with *decreased* appetite control and, therefore, P&G's representation that the Metamucil Powders help support appetite control is false, or at least highly misleading.

42.    When you eat carbohydrates, your blood sugar, or blood glucose level, goes up. When your blood sugar level goes up, it sends signals to your pancreas to release the hormone insulin. When you eat (and especially when you drink) something that has a lot of sugar in it, your blood sugar levels quickly go up. To bring blood sugar levels down, the body responds by releasing insulin into your blood to carry the sugar out. The higher your blood sugar levels the more insulin your body releases. The drop in blood sugar levels in response to the release of insulin can be dramatic, sometimes even causing low blood sugar (hypoglycemia).

43.    In short, consuming high sugar foods and beverages not only causes spikes in blood sugars, but corresponding and drastic dips as well.

44.    This is significant because drops in blood sugar levels are a key regulator of hunger and appetite control. For example, a study of more than a thousand U.S. and U.K. participants looked at "postprandial glucose dips 2-3h after a meal" and found them to be a reliable predictor of postprandial hunger (i.e., hunger levels after eating).[19] Participants consumed 8,624 standardized meals followed by 71,715 ad libitum meals and used continuous glucose monitors to record postprandial glycemia. Participants were asked to fast for 3 hours following the standardized breakfast meals and were then free to eat ad libitum.

---

[19] *See* Wyatt, Patrick, et al., "Postprandial glycaemic dips predict appetite and energy intake in healthy individuals," 3(4) *Nat. Metab.* 523-29 (Apr. 1, 2021).

The study found that "[b]etween the standardised meals, the largest glucose dips followed the meal with the largest glucose rise," and "[t]he Glucose $Dip_{2\text{-}3h}$ was statistically significantly associated with a change in $Hunger_{2\text{-}3h}$ . . . Time until next meal . . . , Energy $intake_{3\text{-}4h}$ . . . , [and] Energy $intake_{24h}$ . . . ."[20]

45.     The relationship between the dip in blood glucose levels and hunger and energy intake may "explain why observational epidemiological . . . studies have shown strong correlations between foods . . . []such as . . . sugar sweetened beverages . . . and weight gain – as consumption of such foods could lead to glucose dips and subsequent hunger."[21]

46.     Another study, involving healthy young women, similarly found "[t]he amount of sugar consumed at breakfast was correlated positively with the sensation of preprandial hunger and food intake at lunch."[22] Thus, "a greater consumption of sugar at breakfast [ ] generate[s] a greater sensation of hunger during the preprandial period compared to the group consuming less sugar, which leads to greater ad libitum consumption of food."[23] "[D]rinks sweetened with sugar[] are rapidly digested and absorbed and provoke a rapid increase in blood glucose, a fact that exacerbates hunger and favors hyperphagia, since these foods are unable to stimulate the mechanisms of satiety [ ]."[24]

47.     A literature review recently explained how sugar consumption also leads to decreased appetite control through feedback loops that involve the same reward pathways as those that cause addiction. Specifically, "[a]ppetite for sugar is propelled by changes in the morphology and activity of the reward systems reminiscent of addiction. Sugar intake also shifts the hunger-satiety continuum, facilitating initiations of consumption in the absence of energy needs and maintenance of feeding despite ingestion of large food loads that endanger [energy] homeostasis."[25] Although humans have evolved to "rely on . . .

---

[20] *Id.*

[21] *Id.*

[22] Penaforte, Fernanda R.O., et al., "Short-term impact of sugar consumption on hunger and ad libitum food intake in young women," 7(2) *Nutr. Research & Practice* 77-81 (2013).

[23] *Id.*

[24] *Id.*

[25] Olszewski, Pawel K., et al., "Excessive Consumption of Sugar: an Insatiable Drive for Reward," 8 *Curr. Nutr. Rep.* 120-28 (2019).

feeding regulatory mechanisms that propel us to obtain high-energy foods," "[i]n the current obesogenic environment in which readily available sugars are overconsumed to the point that endangers our health, these mechanisms are not an asset, but rather a basis of aberrant appetite and metabolic processing."[26] Because "the intake of sweet . . . diets lead[s] to addiction-like molecular and cellular changes in the reward system that propel habitual consumption," and "hijacks the hunger-satiety continuum by shifting it toward perpetual hunger and weakened satiety," "the current obesity 'epidemic' [ ] stems to a large extent from excessive consumption of highly palatable and caloric sugary foods . . . ."[27]

48.     Kathleen Page, who leads the Diabetes & Obesity Research Institute at USC and recently authored a study finding sucrose, the type of sugar in the Metamucil Powders, "produced lower increases in peripheral hormones involved in satiety signaling compared to oral glucose,"[28] "said the takeaway for the general public isn't to switch from one sweet drink to another but to try to reduce added sugar altogether. . . . ."[29]

49.     In short, because scientific studies show that consuming high amounts of sugar like that in the Metamucil Powders decreases appetite control, P&G's appetite control representations are false. These representations are not only false but likely to mislead reasonable consumers who, without referencing such scientific studies, would not know these claims are false.

## IV.     Scientific Studies Demonstrate that P&G's Representation that Metamucil Helps Support Digestive Health is False and Misleading

50.     While P&G represents that the Metamucil Powders "Help[] Support: . . . Digestive Health," scientific evidence actually shows that consuming sugar-sweetened beverages, like the Metamucil Powders, negatively impacts digestive health in a number of ways. This includes harming the gut microbiota and the gut barrier, which leads to ulcerative colitis, Crohn's disease, celiac disease, irritable bowel syndrome and

---

[26] *Id.*

[27] *Id.*

[28] Yunker, Alexander G., et al., "Appetite-Regulating Hormones Are Reduced After Oral Sucrose vs Glucose: Influence of Obesity, Insulin Resistance, and Sex," 106(3) *J. Clin. Endocrinol. Metab.* 654-64 (Mar. 2021).

[29] Hopper, Leigh, "How Sucrose, the 'real' sugar commonly found in sodas, can disrupt your appetite," USC News (Dec. 10, 2020).

diarrhea (among other things). P&G's digestive health representations are false and because the average consumer is unaware of this science, these representations are also misleading.

### A. Consuming the Sugar in Metamucil Harms the Microbiota in the Digestive Tract

51.     The microbiota that lives in the digestive tract is crucial to digestive health.

52.     Further, diet plays a central role in shaping the microbiota that make up the gut biome in human digestive tracts. In fact, studies "suggest that diet has a dominant role over other possible variables such as ethnicity, sanitation, hygiene, geography, and climate, in shaping the gut microbiota."[30]

53.     "[D]iets rich in simple sugars favor the expansion of [harmful microbial] organisms"[31] in at least four distinct ways.

54.     First, simple sugars serve as a nutrient for harmful bacteria and "[r]ecent studies have shown that high intake of sugars increase the relative abundance of [harmful] Proteobacteria in the gut, while simultaneously decreasing the abundance of [beneficial] Bacteroidetes."[32]

55.     Second, and importantly, high sugar diets result in "lost gut microbial diversity."[33]

---

[30] De Filippo, C., et al., "Impact of diet in shaping gut microbiota revealed by a comparative study in children from Europe and rural Africa," 107(33) *PNAS* 14691-96 (August 17, 2010); *see also* Brown, K, et al., "Diet-Induced Dysbiosis of the Intestinal Microbiota and the Effects on Immunity and Disease," 4 *Nutrients* 1095-119 (2012) ("the composition of the gut microbiota strongly correlates with diet as demonstrated by a study assessing the relative contributions of host genetics and diet in shaping the gut microbiota" finding that "dietary changes could explain 57% of the total structural variation in gut microbiota whereas changes in genetics accounted for no more than 12%" which "indicates that diet has a dominating role in shaping gut microbiota") [hereafter "Brown, Diet-Induced Dysbiosis of the Intestinal Microbiota"].

[31] Townsend II, G., et al., "Dietary sugar silences a colonization factor in a mammalian gut symbiont," 116(1) *PNAS* 233-38 (Jan. 2019) [hereinafter "Townsend II, Dietary sugar silences a colonization factor"].

[32] Satokari, R., "High Intake of Sugar and the Balance between Pro- and Anti-Inflammatory Gut Bacteria," 12(5) *Nutrients* 1348-52 (published online May 8, 2020) [hereinafter "Satokari, High Intake of Sugar"].

[33] Ho Do, M., et al., "High-Glucose or -Fructose Diet Cause Changes of the Gut Microbiota and Metabolic Disorders in Mice without Body Weight Change," 10(6) *Nutrients* 761 (June 13, 2018) [hereinafter "Ho Do, High-Glucose or -Fructose Diet Cause Changes of the Gut Microbiota and Metabolic Disorders"]; *see also* Jian-Mei Li, et al., "Dietary fructose-induced gut dysbiosis promotes mouse hippocampal neuroinflammation: a benefit of short-chain fatty acids," 7(98) *Microbiome* 1-14 (June 29, 2019) ("The abundance of Bacteroidetes was significantly decreased and Proteobacteria was significantly increased in fructose-fed mice.") [hereinafter "Jian-Mei Li, Dietary fructose-induced gut dysbiosis"].

56. Third, independent of their effect as a nutrient for harmful microbiota, because consuming sugar increases bile output, "[r]efined sugars" also "mediate the overgrowth of opportunistic[, harmful] bacteria like C. difficile and C. perfringens,"[34] which feed on the bile.

57. Fourth, sugar "can impact gut colonization by the microbiota independently of their ability to serve as nutrients" since both "fructose and glucose silence a critical colonization factor, called Roc, in a widely distributed gut commensal bacterium B. thetaiotaomicron."[35]

58. These changes in the gut microbiota composition harm digestive health and increase risk of chronic digestive track conditions.

59. For example, "[e]vidence suggests that the composition of the intestinal microbiota can influence susceptibility to chronic disease of the intestinal tract including ulcerative colitis, Crohn's disease, celiac disease and irritable bowel syndrome . . . ."[36]

60. In sum, "high sugar intake may stagger the balance of microbiota to have increased pro-inflammatory properties and decreased [] capacity to regulate epithelial integrity and mucosal immunity. Consequently, high dietary sugar can, through the modulation of microbiota, promote metabolic endotoxemia, systemic (low grade) inflammation and the development of metabolic dysregulation and thereby, high dietary sugar may have many-fold deleterious health effects[.]" [37]

**B.   Consuming the Sugar in Metamucil Harms Digestive Health by Impairing Gut Barrier Function**

61. "The gut barrier consists of a specialized, semi-permeable mucosal, and epithelial cell layers that are reinforced by tight junction proteins. Among other functions, this barrier serves to regulate nutrient and water entry and prevents the entry of harmful compounds into extra-luminal tissues" and the blood.[38]

---

[34] Brown, Diet-Induced Dysbiosis of the Intestinal Microbiota, *supra* n.30.

[35] Townsend II, Dietary sugar silences a colonization factor, *supra* n.31 ("dietary simple sugars can suppress gut colonization in a commensal bacterium just by altering the levels of a colonization factor [known as Roc] dispensable for the utilization of such sugars.").

[36] Brown, Diet-Induced Dysbiosis of the Intestinal Microbiota, *supra* n.30.

[37] Satokari, High Intake of Sugar, *supra* n.32.

[38] Noble, E., et al., "Gut to Brain Dysbiosis: Mechanisms Linking Western Diet Consumption, the Microbiome, and Cognitive Impairment," 11(9) *Front Behav. Neurosci.* 1-10 (Jan. 2017).

62.     When the permeability of the gut or epithelial barrier is increased, this "allows for the influx of adverse substances and may ultimately contribute to the development of metabolic disorders . . . ."[39]

63.     "A compromised gut barrier makes the intestinal tract potentially vulnerable to the gram-negative bacteria-derived LPS, which upon excess entry into circulation promotes endotoxemia and systemic inflammation."[40]

64.     Both glucose and fructose increase gut barrier permeability.

65.     "Although dietary fructose was thought to be metabolized exclusively in the liver, evidence has emerged that it is also metabolized in the small intestine and leads to intestinal epithelial barrier deterioration."[41] A high fructose diet, for example, has been found to result in the "thinning of the intestinal mucosa, epithelium, and muscularis mucosae; [and] loss of crypts and glands," among other harmful effects.[42]

66.     The "increase[d] intestinal permeability," in turn "precedes the development of metabolic endotoxemia, inflammation, and lipid accumulation, ultimately leading to hepatic steatosis and normal-weight obesity." [43]

67.     In addition, "[t]he monosaccharide fructose can escape absorption in the small intestine and reach the microbiota in the distal gut, where microbiota-derived products of fructose metabolism enter the host blood."[44]

68.     Thus, "excessive fructose consumption" has been shown to "result[] in barrier deterioration,

---

[39] *Id.*

[40] *Id.* (Studies have found "elevated plasma levels of a gavaged fluorescent molecule (FITC-dextran) that is typically unable to cross the gut barrier.").

[41] Febbraio, M., et al., "'Sweet death': Fructose as a metabolic toxin that targets the gut-liver axis," 33(12) *Cell Metab.* 2316-28 (Dec. 7, 2021) [hereinafter "Febbraio, Fructose as a metabolic toxin that targets the gut-liver axis"].

[42] Jian-Mei Li, Dietary fructose-induced gut dysbiosis, *supra* n.33.

[43] Ho Do, High-Glucose or -Fructose Diet Cause Changes of the Gut Microbiota and Metabolic Disorders, *supra* n.33.

[44] Townsend II, Dietary sugar silences a colonization factor, *supra* n.31.

dysbiosis, low-grade intestinal inflammation, and endotoxemia."[45]

69.    In short, consuming fructose, like that in the Metamucil Products, has numerous harmful effects on the gut barrier.[46, 47, 48, 49]

70.    Like fructose, glucose also harms the gut barrier. For example, both a "[high glucose diet] and [high fructose diet] increased gut permeability and disrupted the gut barrier."[50] This harms the health of the digestive track because "damaged gut barriers" lead to endotoxins crossing the epithelial and into the blood stream, resulting in "higher [blood] plasma endotoxin levels."[51]

71.    Not only does glucose harm the gut barrier from within the digestive track, high levels of glucose in the blood, known as "[h]yperglycemia[,] markedly interfered with homeostatic epithelial integrity, leading to abnormal influx of immune-stimulatory microbial products and a propensity for systemic spread of enteric pathogens."[52] This happens, at least in part, because "hyperglycemia causes

---

[45] Febbraio, Fructose as a metabolic toxin that targets the gut-liver axis, *supra* n.41.

[46] Satokari, High Intake of Sugar, *supra* n.32 (consuming high amounts of sugar harms the gut by "increas[ing] small intestinal permeability in healthy humans").

[47] Ho Do, High-Glucose or -Fructose Diet Cause Changes of the Gut Microbiota and Metabolic Disorders, *supra* n.33 ("diet induced changes in the gut microbiota affect the expression of tight junction proteins and inflammatory cytokines, which leads to increased gut permeability and inflammation").

[48] Febbraio, Fructose as a metabolic toxin that targets the gut-liver axis, *supra* n.41 ("fructose, . . . led to the downregulation of enterocyte tight-junction proteins and subsequent barrier deterioration, which is in agreement with previous rodents and human studies (Jin et al., 2014; Kavanagh et al., 2013; Lambertz et al., 2017; Spruss et al., 2012)").

[49] Young-Eun Cho, et al., "Fructose Promotes Leaky Gut, Endotoxemia, and Liver Fibrosis Through Ethanol-Inducible Cytochrome P450-2E1–Mediated Oxidative and Nitrative Stress," 73(6) *Hepatology*, 2180-95 (Apr. 8, 2019) ("fructose intake causes protein nitration of intestinal [tight-junction] and AJ proteins, resulting in increased gut leakiness, endotoxemia, and steatohepatitis with liver fibrosis").

[50] Ho Do, High-Glucose or -Fructose Diet Cause Changes of the Gut Microbiota and Metabolic Disorders, *supra* n.33.

[51] *Id.*

[52] Thaiss, C., et al., "Hyperglycemia drives intestinal barrier dysfunction and risk for enteric infection," 359 *Science* 1376-83 (Mar. 23, 2018) ("We have identified glucose as an orchestrator of intestinal barrier function.").

retrograde transport of glucose into intestinal epithelial cells via GLUT2, followed by alterations in intracellular glucose metabolism and transcriptional reprogramming."[53]

72.     In short, "experiments establish hyperglycemia as a direct and specific cause for intestinal barrier dysfunction and susceptibility to enteric infection,"[54] such that "[b]lood glucose concentrations are associated with microbial product influx in humans[.]"[55]

73.     Because consuming "[s]ugar has [ ] been shown to irritate the lining of the stomach and intestine," it actually "compromises digestive function and the absorption of nutrients" and can "induce diarrhoea [sic]."[56]

74.     Because consuming the added sugar in the Metamucil Powders harms digestive health in multiple ways, P&G's representation that the Metamucil Powders "Helps Support: . . . Digestive Health" is false, or at least highly likely to mislead reasonable consumers who, without referencing such scientific studies, would not know these claims are deceptive.

## V.     P&G's Representations and Omissions are False and Misleading

75.     As scientific evidence demonstrates, P&G's "Healthy Blood Sugar Levels," "Appetite Control," and "Digestive Health" representations are false.

76.     These representations are also misleading, and have the capacity, tendency, and likelihood to confuse or confound Plaintiff and other consumers acting reasonably. This is because the average consumer would believe that the Metamucil Powders provide the represented benefits—despite containing added sugar—because the average consumer does not know the extent to which consuming the sugar in the Metamucil Powders adversely affects blood sugar levels, appetite control, and/or digestive health.

77.     The average consumer is not intimately familiar with the scientific evidence regarding the health effects of consuming sugar or psyllium fiber. And there is no way for a consumer to know—by simply

---

[53] *Id.*

[54] *Id.*

[55] *Id.* (Human studies "suggest that similar to their effects in mice, serum glucose concentrations, rather than obesity, may associate with or potentially even drive intestinal barrier dysfunction in humans.").

[56] DiNicolantonio JJ, Berger A., "Added sugars drive nutrient and energy deficit in obesity: a new paradigm," 3(2) *Open Heart* e000469, 1-6 (2016).

looking at the label and without reviewing the scientific evidence—whether or not the Metamucil Powders provide the claimed benefits.

78.    Because most consumers are unfamiliar with the details of scientific evidence showing how and at what levels added sugar consumption causes health harms, even the few consumers that review a product's added sugar content[57] are often unable to decern the physiological effect of that amount of sugar. Accordingly, research consistently shows that even when consumers read a label's provided nutrient information, they have difficulty deciphering and applying that information, and often draw incorrect conclusions based on than information.

79.    For instance, the FDA "mandated nutrition labels have been criticized for being too complex for many consumers to understand and use"[58] because "[u]sing NFP labels requires not only being able to read and perform arithmetic but also—just as importantly—the ability to reason with words and numbers." Therefore, research shows that "a substantial proportion of consumers clearly struggle to effectively use the information contained in a nutrition label."[59]

80.    Survey research demonstrates, for example, that consumers "[are] not very good at using the [nutrition] label to make mathematical calculations, evaluate false claims, or draw dietary implications about a product."[60] Accordingly, the nutrition label is "an inadequate tool for helping people to plan diets" and "unlikely to contribute by itself to a better or more critical understanding of nutrition principles."[61]

---

[57] Research by the University of Minnesota's Epidemiology Clinical Research Center involving a simulated grocery shopping exercise on a computer equipped with an eye-tracking camera shows that, even for the relatively small subset of consumers that told researchers they "almost always" look at a product's sugar content (24%), only about 1% actually look beyond the calorie count to other components of the Nutrition Facts panel, such as sugar. *See* Graham & Jeffery, "Location, location, location: Eye-tracking evidence that consumers preferentially view prominently positioned nutrition information," 111 *J. Am. Diet. Assoc.* 1704-11 (2011).

[58]  Persoskie A, Hennessy E, Nelson WL, "US Consumers' Understanding of Nutrition Labels in 2013: The Importance of Health Literacy," 14 *Prev. Chronic Dis.* 170066, 1-11 (2017) [hereinafter "Persoskie, US Consumers' Understanding"].

[59] *Id*. ("Some studies have found that even high school graduates and college students lack the basic health literacy skills to effectively apply nutrition label information[ ].").

[60] Levy & Fein, "Consumers' ability to perform tasks using nutrition labels," 30(4) *J. Nutr. Educ. & Behav.* 210-17 (1998).

[61] *Id.*

19

81.     In one survey, more than 3,000 U.S. adults viewed an ice cream nutrition label and then answered four questions that tested their ability to apply, understand, and interpret the nutrition information. Approximately 24% of people could not determine the calorie content of the full ice-cream container, 21% could not estimate the number of servings equal to 60g of carbohydrates, 42% could not estimate the effect on daily calorie intake of foregoing 1 serving, and 41% could not calculate the percentage daily value of calories in a single serving.[62] Only 53.9% of respondents who had earned a 4-year college degree could correctly answer all four nutrition label questions.[63]

82.     Even "frequent use of nutrition labels does not promote understanding of [nutrient] levels."[64]

83.     Marketing claims on foods can thus cause "[c]onsumers [to] perceive health differences even when two products have the same Nutrition Facts label[.]"[65]

84.     Not surprisingly, a 2017 Shopper Trends Study by Label Insights found that "67% of consumers say it is challenging to determine whether a food product meets their [dietary] needs simply by looking at the package label[.]"[66]

85.     Even the FDA recently recognized "many consumers would like to know how to use th[e] [Nutrition Facts] information more effectively and easily," and so it published a guide on "How to Understand and Use the Nutrition Facts Label." It took the FDA nearly twelve pages to explain how to

---

[62] Persoskie, US Consumers' Understanding, *supra* n.58.

[63] *Id.*

[64] Soederberg Miller, Lisa M., et al., "The Effects of Nutrition Knowledge on Food Label Use: A Review of the Literature," 92 *Appetite* 207-16 (2015) (citing Howlett, Elizabeth, et al., "How modification of the nutrition facts panel influences consumers at risk for heart disease: The case of trans fat," 27(1) *J. Public Policy & Marketing* 83-97 (2008)).

[65] *See* International Food Information Council, "2021 Food & Health Survey," at 31 (2021), *available at* https://foodinsight.org/wp-content/uploads/2021/05/IFIC-2021-Food-and-Health-Survey.May-2021-1.pdf.

[66] "Study Shows Labeling Often Confuses Consumers," *Packaging Strategies* (Mar. 30, 2017), *available at* https://www.packagingstrategies.com/articles/94081-study-shows-labeling-often-confuses-consumers (citing Label Insight 2017 Shopper Trends Study, *available at* https://tinyurl.com/ms4fwfmn).

"make it easier for you to use the Nutrition Facts labels to make quick, informed food decisions to help you choose a healthy diet."[67]

86.      The problem is so pervasive that the FDA created an entire "education campaign" designed to "help consumers, health care professionals, and educators learn how to use [the Nutrition Facts Label] as a tool for maintaining healthy dietary practices"—thus recognizing the current widespread confusion, even among "health care professionals," in how to properly use the Nutrition Facts to make healthy choices.[68]

87.      Another major problem is that "sugar interests have, in fact, intentionally and actively worked for more than 40 years to suppress the scientific evidence linking sugar consumption to negative health consequences."[69]

88.      As one article described it, "[i]nternal US sugar industry documents recently revealed the part that the industry conspiracy with scientists, and by lobbying public institutions, played in the 1960s and 1970s in determining that public health policy to reduce mortality from coronary heart disease should focus on saturated fats as the main cause of such disease whilst ignoring the impact of sugar consumption."[70]

89.      Documents that became public during the course of a lawsuit between rival sugar industry groups revealed that the sugar industry has engaged in "unscrupulous strategies reminiscent of the tobacco and fossil fuel industries, including manufacturing doubt about the science and engaging in deliberate and elaborate misinformation campaigns."[71]

---

[67] FDA, "How to Understand and Use the Nutrition Facts Label," (last updated Feb. 25, 2022) *available at* https://www.fda.gov/food/new-nutrition-facts-label/how-understand-and-use-nutrition-facts-label#top.

[68] *See* FDA, "The New Nutrition Facts Label—What's in it for you?" (last updated Apr. 13, 2022) *available at* https://www.fda.gov/food/nutrition-education-resources-materials/new-nutrition-facts-label.

[69] Gretchen Goldman et al., Union of Concerned Scientists, "Industry Tactics to Obscure the Science: How Industry Obscures Science and Undermines Public Health Policy on Sugar" (2014). *See also* Kearns CE, et al., "Sugar Industry and Coronary Heart Disease Research: A Historical Analysis of Internal Industry Documents," 176(11) *JAMA Intern. Med.* 1680-85(2016).

[70] Alejandro Calvillo, NCD Alliance, Public health sequestered for 50 years by sugar industry, (Sept. 29, 2016), *available at* https://ncdalliance.org/news-events/blog/new-blog-public-health-sequestered-for-50-years.

[71] Goldman, "Industry Tactics to Obscure the Science: How Industry Obscures Science and Undermines Public Health Policy on Sugar," *supra* n.69.

90.     The Union of Concerned Scientists identified five main tactics used by the sugar industry. These include:

Tactic 1: Attacking the Science
- Planning to "bury the data" if the science is inconvenient
- Threatening to suspend funding to the World Health Organization
- Seeking to discredit scientific findings by intimidating the study authors …

Tactic 2: Spreading Misinformation
- Emphasizing unknowns while ignoring what is known
- Repeating untruthful claims
- Manufacturing bogus scientific claims
- Widely publishing claims that have not been subjected to scientific scrutiny

Tactic 3: Deploying industry scientists
- Exploiting science communication and blogging communities
- Failing to disclose scientists' conflicts of interest
- Hijacking scientific language for product promotion

Tactic 4: Influencing academia
- Buying credibility through academic scientists
- Funding research to support their preconceived positions
- Paying academic scientists to persuade other scientists of sugar interests' positions

Tactic 5: Undermining policy
- Pouring lobbying dollars into sugar policy debates at the federal, state, and local levels
- Supporting political candidates in influential positions
- Influencing rule making at federal agencies

91.     As we now know, sugar interests secretly created an immense amount of disinformation making it hard for ordinary consumers to understand the harms of sugar such that simply knowing the amount of sugar is not sufficient for most consumers to understand the negative impact that sugar will have.

92.     One of the main goals of such disinformation campaigns is to "manufacture doubt"[72] so that consumers do not know what to believe. Survey evidence demonstrates this problem is prevalent regarding nutrition. For example, among the "Key Findings" of the 2018 Food & Health Survey from the International Food Information Council (IFIC), which surveyed approximately 1,000 American consumers to understand their perceptions, beliefs and behaviors around food and food purchasing decisions, found that 80% of the surveyed consumers encountered contradictory information about food and nutrition in their search for nutritious foods, making "consumer confusion . . . a prevalent issue."[73] Another key finding was that "[c]ontext can influence the consumer's judgement of healthfulness, even when the nutritional facts are the same[.]"[74]

93.     Thus, review of the Metamucil Powders' supplement information is unlikely to sufficiently inform consumers regarding the Products' inability to deliver the promised health benefits because the vast majority of consumers do not have the expertise needed to accurately determine a products' physiological effect from a review of its included nutrients.

94.     In addition, to its affirmative misrepresentations, P&G's omissions are misleading to the reasonable consumer. More specifically, even if the fiber in the Metamucil Powders is capable of providing some benefits *absent* the large amount of added sugar in the Products, P&G deceptively omits material facts regarding the effects of consuming sugar on blood sugar, appetite control, and digestive health.

95.     Because the Metamucil Powders provide more sugar than fiber, it is deceptive for P&G to market the Metamucil Powders as having benefits associated with consuming fiber, without disclosing the countervailing detriments associated with consuming added sugar—facts that a reasonable consumer would consider material.

---

[72] *See* Goldberg RF and Vandenberg LN, "The science of spin: targeted strategies to manufacture doubt with detrimental effects on environmental and public health," 20(33) *Environ. Health* 1-11 (Mar. 2021) (describing how "[n]umerous groups, such as the tobacco industry, have deliberately altered and misrepresented knowable facts and empirical evidence to promote an agenda, often for monetary benefit," including the sugar industry); Goldberg RF and Vandenberg LN, "Distract, display, disrupt: examples of manufactured doubt from five industries," 34(4) *Rev Environ Health* 349-63 (2019).

[73] IFIC, "2018 Food & Health Survey," at pp. 3, 5, *available at* https://foodinsight.org/wp-content/uploads/2018/05/2018-FHS-Report-FINAL.pdf.

[74] *Id.*

96.     P&G's conduct is particularly deceptive since it "know[s] that . . . the average American eats 22 teaspoons of sugar per day"—"more than double the recommended daily amount"—and "less than 10% of Americans get their daily recommended fiber intake each day," making "[t]he sugar surplus and fiber gap in today's typical diet [ ] a real problem."[75] In a video on its YouTube channel, P&G updated this statistic (presumably to reflect authoritative bodies recommending a lower sugar limit), stating "the average American eats 22 teaspoons of sugar per day. That's more than *triple* the recommended daily amount[]. Along with the high amounts of sugar the average American is also consuming only 15 to 16 grams of fiber per day. That's only about half of the daily requirements. . . . The sugar surplus and the fiber gap in today's typical diet is a real problem. One reason this trend is so concerning is because high intake of sugar with low intake of fiber can make it difficult to maintain healthy blood sugar levels."[76] Despite acknowledging the overconsumption of sugar and underconsumption of fiber among Americans, the Metamucil Powders contain more sugar than fiber, thereby making matters worse, not better.

97.     Therefore, a reasonable consumer is likely to believe that the Metamucil Powders provide the claimed benefits despite their added sugar.

98.     P&G's representations and omissions are also deceptive in light of its instructing consumers to ingest up to six rounded teaspoons or tablespoons daily (depending on variety) of the Metamucil Powders, when doing so would cause many consumers to exceed the daily added sugar intake levels recommended by authoritative health bodies to prevent harm to health, especially since P&G knows Americans are already consuming "more than triple the recommended daily amount."[77]

99.     P&G's marketing of the Metamucil Powders to children aged 12 through 18 and advising them to ingest up to six rounded teaspoons or tablespoons daily (depending on variety) of the Metamucil Powders, is particularly deceptive when doing so would cause most children to exceed the daily added sugar intake levels recommended by authoritative health bodies to prevent harm to health.

---

[75] P&G, Healthy Blood Sugar Levels, *supra* n.6.

[76] https://www.youtube.com/watch?v=pTiA9D79ai0.

[77] P&G, Healthy Blood Sugar Levels, *supra* n.6.

100.    By marketing the Metamucil Powders as the "#1 Doctor Recommended Brand," P&G reinforces the false and misleading message that the Metamucil Powders are beneficial to health and effective in providing the claimed health benefits. Because the Metamucil Powders, however, do not provide the claimed health benefits, but instead—due to their added sugar content—actually decrease appetite control and harm blood sugar levels, digestive health, and overall health, P&G's use of the "#1 Doctor Recommended" statement is unfair and deceptive.

101.    While representing that the Metamucil Powders help support healthy blood sugar levels, appetite control, and digestive health, P&G regularly and intentionally omits material information regarding the countervailing detrimental effects of the added sugars in the Metamucil Powders on blood sugar levels, appetite control, and digestive health.

102.    P&G is under a duty to disclose this information to consumers because it is revealing some information about the Metamucil Powders—enough to suggest they help support healthy blood sugar levels, appetite control, and digestive health—without revealing directly relevant information regarding the harmful effects of added sugar on blood sugar levels, appetite control, and digestive health.

103.    P&G is under a duty to disclose this information because its deceptive omissions concern human health and safety, specifically the detrimental health consequences of consuming the Products.

104.    P&G is under a duty to disclose this information because it was in a superior position to know of the dangers presented by the sugars in the Metamucil Powders, as it is a large, sophisticated company that holds itself out as having expert knowledge regarding the impact of consuming Metamucil Powders. For example, P&G provides information on its website regarding the "Benefits, Dosage, [and] Side Effects" of consuming the Metamucil Powders. The webpage—dedicated to providing information to "Healthcare Professionals"—discusses topics such as "Are there any drug interactions or restrictions with

Metamucil?"[78] Additionally, P&G sponsors and publishes articles about "Digestive Wellness,"[79] "How [to] Maintain Healthy Blood Sugar Levels,"[80] and "How to Stop Feeling Hungry Between Meals."[81]

105.    On its YouTube channel, P&G shows videos of doctors wearing lab coats and stethoscopes touting the supposed benefits of Metamucil consumption. Notably, although the doctors in P&G's videos do not specify which version of Metamucil is being discussed, using broad general language that could apply to all of P&G's Metamucil products, when Metamucil products are shown in P&G's doctor videos, only the sugar free versions are shown.[82] At no point in the videos, however, are viewers informed that the benefits being touted by the doctors are limited to any particular version of Metamucil.

106.    P&G is under a duty to disclose this information because it actively concealed material facts not known to Plaintiff and the Class.

## VI.    P&G's Marketing of the Metamucil Powders is Unfair

107.    Because the Metamucil Powders do not support "Healthy Blood Sugar Levels," "Appetite Control," and "Digestive Health," their labeling is false and misleading regardless of the context in which the Metamucil Powders are presented to consumers.

---

[78] https://www.metamucil.com/en-us/faqs/hcp-faqs.

[79] *See* https://www.metamucil.com/en-us/articles ("All Articles" on "Digestive Wellness").

[80] P&G, Healthy Blood Sugar Levels, *supra* n.6.

[81] Procter & Gamble, "How to Stop Feeling Hungry Between Meals," https://www.metamucil.com/en-us/articles/metamucil-benefits/tips-to-stop-feeling-hungry-between-meals.

[82] *See* https://www.youtube.com/watch?v=9WkIv1v5beM (at 1:04, 1:47, and 1:54); https://www.youtube.com/watch?v=RwB62FZrKU4 (at 1:17 and 2:05); https://www.youtube.com/watch?v=Fy4EWlPc14g&t=4s (at 1:34, 1:49, and 1:56); https://www.youtube.com/watch?v=Iezdivz_xR0 (at 1:02, 1:54, and 2:01); https://www.youtube.com/watch?v=FPBQZrod7ro (at 0:59, 1:10, and 1:49).

108.    P&G's practice of marketing the sugary Metamucil Powders identically to its sugar-free products, however, is a further unfair business practice because it conveys that the sugary Metamucil Powders will provide health benefits identical to those of P&G's sugar-free products. For example, as shown below, the labeling for P&G's *sugar-free* orange flavored Metamucil powder is materially identical to the labeling of the orange flavored Metamucil Powder containing sugar, claiming the product is similarly supportive of "Healthy Blood Sugar Levels," "Appetite Control," and "Digestive Health."[83]

109.    Usually, P&G's sugar-free Metamucil products, like the one pictured above, are displayed for sale directly next to the Metamucil Powders challenged herein.

110.    Because all of P&G's Metamucil products are marketed as providing identical health benefits regardless of whether they are "SUGAR-FREE" or "MADE WITH REAL SUGAR," consumers reasonably, but unfairly, believe the Metamucil Powders will be equally as effective at providing the promised health benefits *regardless of their sugar content*.

111.    That P&G intends consumers to believe that its Metamucil products deliver identical health



benefits regardless of their sugar content is further evidenced through advertising campaigns like the "two-week challenge." P&G invites consumers to choose *any* powder or capsule Metamucil fiber product "that

[83] Plaintiff is not challenging any of P&G's sugar-free Metamucil products or their labeling.

fits [their] lifestyle" and take it "up to 3x per day" every day for two weeks, after which P&G claims consumers will be "well on [their] way to making it a part of [their] daily health routine."[84] P&G claims, without qualification, that **all** of "Metamucil's psyllium fiber capsules and powders <u>have three different benefits</u> that support your overall health and wellbeing."[85] In advertising its two-week challenge, P&G consistently pictured both "sugar-free" and "made with real sugar" varieties of its Metamucil products as equally "healthy habit[s] to [add] to your routine every day."[86]

112.   P&G's unfair practice of marketing its sugary and sugar-free products as equally capable of providing the promised health benefits also contributes to the deceptive nature of P&G's "Doctor Recommended" statement on the Metamucil Powders. P&G's use of the "Doctor Recommended" statement across *all* Metamucil products regardless of their sugar content implies that the sugary Metamucil Powders are recommended by doctors equally as often as P&G's sugar-free products when, in truth, doctors are extremely *unlikely* to recommend a product containing as much added sugar as the Metamucil Powders.

---

[84]   *See* Sign up for Metamucil's Two-Week Challenge, https://www.metamucil.com/en-us/articles/metamucil-benefits/the-two-week-challenge-easiest-way-to-stay-regular-and-avoid [hereinafter "Metamucil's Two-Week Challenge"]. The underlined phrase, "<u>have three different benefits,</u>" links to a page discussing the supposed "Metamucil Benefits" of "Healthy Blood Sugar Levels," "Appetite Control," and "Digestive Health," again without distinction between its "sugar-free" and "made with real sugar" varieties. *See* https://www.metamucil.com/en-us/articles/metamucil-benefits/benefits-of-metamucil-fiber-supplement.

[85]   *Id.*

[86]   Metamucil's Two-Week Challenge, *supra* n.84. *See also* https://www.metamucil.com/en-us/faqs/metamucil-faqs (response to FAQ "Can I take Metamucil every day?" is "Yes! For best results, we recommend taking . . . Metamucil every day.")

28

**VII.    The Metamucil Powders are Marketed as Treatments for Constipation and Irregularity**

113.    On the label of each Metamucil Powder, P&G advises consumers "How Much To Take" to support "Digestive Health[] *by promoting regularity*." By marketing the Metamucil Powders as "promoting regularity," P&G is marketing the Products as laxatives, rendering them unapproved new drugs.



114.    The label of each Metamucil Powder also states that in taking the Product, "You may experience changes in bowel habits" and to "Stop Using . . . if constipation lasts more than 7 days . . . ."

115.    These statements are nearly identical to those appearing on P&G's Metamucil "on-the-go" products (not challenged herein), which P&G concedes are over the counter laxatives, the labels of which must include "Drug Facts." P&G's "on-the-go" products are identically marketed as "help[ing] support[] . . . Digestive Health," and include instructions on how to use the products "for relief of occasional

29

constipation (irregularity)"—a distinction without a difference from the Metamucil Powders' claim to "promote regularity"—and their labels likewise advise consumers, "you may experience changes in bowel habits" and to "stop use . . . if [ ] constipation lasts longer than 7 days[.]"[87]



---

[87] From a formulation perspective, the Metamucil Powders challenged herein contain 2.4 grams of psyllium husk, and "on-the-go" varieties of Metamucil contain approximately 3.4 grams of psyllium husk. *See* https://www.metamucil.com/en-us/products/fiber-powders/orange-fiber-therapy-single-packets ("Active Ingredient" in "Drug Facts" listed as "approximately 3.4 g" of "Psyllium Husk"). P&G instructs consumers to take the Metamucil Powders "up to 3 times per day" to "promot[e] regularity," however, and three servings amount to 7.2 grams of psyllium husk—more than twice the amount in one "on-the-go" packet, which P&G claims will "generally produce[] [a] bowel movement in 12 to 72 hours." *Id.* ("Uses" listed in "Drug Facts").

30

116.     Statements made by P&G on its website further demonstrate P&G's intent to market the Metamucil Powders as laxatives. On its website, P&G has an entire section of articles dedicated to the topic of "Constipation,"[88] including about "Occasional Constipation 101: Causes, Symptoms and Treatments," which advises those experiencing "occasional constipation" to "[i]ncrease [their] fiber intake . . . by taking a fiber supplement. . . . like the plant-based psyllium in Metamucil . . . ."[89] The article makes no distinction between the different varieties of Metamucil and clicking on the words "fiber supplement" in the article brings you to a page displaying *all* of P&G's Metamucil products, including the Metamucil Powders challenged herein.[90]

117.     In an article titled "How Can Fiber Supplements Help Occasional Constipation," P&G touts "Psyllium fiber [a]s that gold standard fiber for occasional constipation" and then states "Metamucil powder supplements are a great source of psyllium husk fiber, and Metamucil is the only leading brand that contains plant-based psyllium fiber[]."[91] Clicking on the words "Metamucil powder supplements" in that statement takes consumers to a page displaying all of P&G's Metamucil products, including the Metamucil Powders challenged herein.[92]

118.     Another P&G article titled "9 Easy Remedies for Occasional Constipation Relief" claims that "Metamucil is made with psyllium husk, a plant-based fiber that helps promote digestive health and regularity.[] It also acts as a non-stimulant laxative that relieves occasional constipation, generally helping **you produce a bowel movement in 12 to 72 hours."**[93] While this article does mention "Metamucil On-the-Go Powder Packets" it also mentions "Metamucil Sugar-Free Orange Smooth Powder . . . as an easy way to help relieve occasional constipation" and otherwise discusses more generally "psyllium-based fiber supplement[s] like Metamucil" without specifying a particular variety, thus implying its advise for relieving

---

[88] https://www.metamucil.com/en-us/articles/constipation.

[89] https://www.metamucil.com/en-us/articles/constipation/occasional-constipation-101-causes-symptoms-and-treatments.

[90] *See id.*

[91] https://www.metamucil.com/en-us/articles/constipation/how-fiber-supplements-help-constipation.

[92] *See id.*

[93] https://www.metamucil.com/en-us/articles/constipation/constipation-relief (emphasis in original).

occasional constipation applies to all versions of its Metamucil products, regardless of whether they are labeled for "on-the-go."[94]

119.    P&G's online FAQs also demonstrate that at one point in time, P&G conceded *all* of its Metamucil powders were marketed as laxatives and so all displayed "Drug Facts." In its "FAQs" for "Healthcare Professionals" regarding the "Benefits, Dosage, [and] Side Effects" of Metamucil, P&G includes the question "Why have the drug facts, drug information been removed from the Metamucil Powders labels?"[95] P&G's response is that "Metamucil MultiHealth Fiber is now presented under the Meta health line and is a daily fiber supplement. The label information has been updated to communicate the usage and directions to obtain the multihealth benefits of this fiber supplement. Therefore, the Drug Facts have been removed from the labels of most of our products. For those who still want to use Metamucil as a therapy for occasional constipation, there are four Metamucil products that retained the drug facts as a fiber therapy for regularity. These include the Metamucil Orange Powder 30 count singles . . . ."[96] The "singles" P&G is referencing are its Metamucil "on-the-go" single-serve packets (not challenged herein).

120.    Although P&G claims its "Metamucil MultiHealth Fiber" products now provide "multihealth benefits" and so are no longer laxatives, but fiber supplements instead, P&G continues to market the Metamucil Powders for "promoting regularity," advises consumers they "may experience changes in bowel habits" when taking the Metamucil Powders, and does not distinguish between the "multihealth" and "on-the-go" products in advising consumers on its website how to relieve constipation. Given P&G's marketing of the Metamucil Powders, consumers reasonably believe the Products are laxatives, even where they also reasonably believe P&G's other health promises of "Appetite Control," "Healthy Blood Sugar Levels" and "Digestive Health."

121.    FDA also lists as a common ingredient in "[b]ulk laxatives," "psyllium (hemicellulose), psyllium hydrophilic mucilloid, psyllium seed, psyllium seed (blond), psyllium seed husks, plantago husks,

---

[94] *See id.*

[95] https://www.metamucil.com/en-us/faqs/hcp-faqs. That this is a frequently asked question demonstrates confusion regarding whether the Metamucil Powders are laxatives, even among healthcare professionals.

[96] *Id.*

or plantago seed including, but not limited to, any granules that are: . . . [d]ispersed, suspended, or partially dissolved in liquid prior to swallowing[.]" 21 C.F.R. § 310.545(a)(12)(i)(B).

**VIII.   The Metamucil Powders' Labeling Violates California and Federal Law**

122.    The Metamucil Powders and their challenged labeling statements violate California Health and Safety Code §§109875, *et. seq.* (the "Sherman Law"), which has expressly adopted the federal food labeling requirements as its own. *See*, *e.g.*, *id.* § 110100; *id.* § 110670 ("Any food is misbranded if its labeling does not conform with the requirements for nutrition labeling as set forth in Section 403(r) (21 U.S.C. Sec. 343(r)) of the federal act and the regulation adopted pursuant thereto.").

123.    First, the challenged claims are false and misleading for the reasons described herein, in violation of 21 U.S.C. § 343(a), which deems misbranded any food whose "label is false or misleading in any particular." P&G accordingly also violated California's parallel provision of the Sherman Law. *See* Cal. Health & Safety Code § 110670.

124.    Second, despite making the challenged claims, P&G "fail[ed] to reveal facts that are material in light of other representations made or suggested by the statement[s], word[s], design[s], device[s], or any combination thereof," in violation of 21 C.F.R. § 1.21(a)(1). Such facts include the detrimental health consequences of consuming the Metamucil Powders at typical levels, including negatively impacting "Blood Sugar Levels," "Appetite Control," and "Digestive Health." In addition, such facts include the detrimental health consequences of consuming the Metamucil Powders at typical levels including increased risk of metabolic disease, cardiovascular disease, type 2 diabetes, liver disease, obesity, high blood triglycerides and cholesterol, hypertension, and death, which would be material to a consumer choosing a fiber powder.

125.    Third, P&G failed to reveal facts that were "[m]aterial with respect to the consequences which may result from use of the article under" both "[t]he conditions prescribed in such labeling," and "such conditions of use as are customary or usual," in violation of § 1.21(a)(2). P&G failed to disclose both (1) the increased risk of serious chronic disease and death that is likely to result from the usual consumption of the Metamucil Powders in the customary and prescribed manners, including regular consumption of the

standard serving size and (2) the detrimental health consequences of consuming the Metamucil Powders at typical levels on "Blood Sugar Levels," "Appetite Control," and "Digestive Health."

126.    Fourth, the Metamucil Powders are misbranded drugs because they are "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man," 21 U.S.C. § 321(g)(1)(B), namely to mitigate or treat "occasional constipation (irregularity)," yet are marketed, labeled, and sold as supplements. The Metamucil Powders are also drugs as defined in Cal. Health & Safety Code § 109925, and so are misbranded under California's Sherman Law as well.

## IX.    Plaintiff's Purchase, Reliance, and Injury

127.    As best she can recall, Plaintiff purchased orange flavored Metamucil made with real sugar during the Class Period starting, approximately, in late 2017 or early 2018, with her last purchase in early 2022. Plaintiff would often make her purchases from stores such as CVS, Target, and Walgreens in San Bruno, California.

128.    When purchasing the Metamucil Powders, Plaintiff was seeking a fiber powder that would provide benefits related to healthy blood sugar levels, appetite control, and digestive health as represented on the Metamucil Powders' labeling. In purchasing Metamucil, Plaintiff was exposed to, read, and relied on P&G's representations that its consumption would promote appetite control, healthy blood sugar levels, and digestive health, which communicated to her that it would provide these benefits and was generally healthy to consume and would not detriment her overall health with regular consumption. These claims, however, were and are deceptive because the Metamucil Powders actually decrease appetite control, harm blood sugar levels, and damage digestive and overall health.

129.    Plaintiff is not a nutritionist, food expert, or food scientist, but rather a lay consumer who did not have the specialized knowledge that P&G had regarding the impact of the nutrients present in the Metamucil Powders. At the time of purchase, Plaintiff was unaware of the extent to which consuming added sugar in the amounts found in the Metamucil Powders adversely affects blood sugar levels, digestive health, appetite control, and overall health, and what amount might have such an adverse effect.

130.   Plaintiff acted reasonably in relying on the challenged labeling claims, which P&G intentionally placed on the Metamucil Powders' labeling with the intent to induce average consumers into purchasing the Products.

131.   Plaintiff would not have purchased the Metamucil Powders if she knew that the challenged claims were false and misleading in that the Metamucil Powders do not provide any of the claimed benefits, meaning, healthy blood sugar levels, appetite control, or digestive health, and are not beneficial to health.

132.   The Metamucil Powders cost more than similar products without misleading labeling and would have cost less absent P&G's false and misleading statements and omissions.

133.   Through the misleading labeling claims and omissions, P&G was able to gain a greater share of the fiber powder market than it would have otherwise and to increase the size of the market.

134.   Plaintiff paid more for the Metamucil Powders, and would only have been willing to pay less, or unwilling to purchase them at all, absent the false and misleading labeling complained of herein.

135.   Plaintiff would not have purchased the Metamucil Powders if she had known that the products were misbranded pursuant to California and FDA regulations, or that the challenged claims were false or misleading.

136.   For these reasons, the Metamucil Powders were worthless and had less value than what Plaintiff and the Class paid for them.

137.   Instead of receiving products that had actual healthful qualities, the Metamucil Powders that Plaintiff and the Class received were likely to lead to increased risk of disease when consumed regularly.

138.   Plaintiff and the Class lost money as a result of P&G's deceptive claims, omissions, and practices in that they did not receive what they paid for when purchasing the Metamucil Powders.

139.   Plaintiff still wishes to purchase healthy fiber powders and continues to see the Metamucil Powders at stores when she shops. She would purchase Metamucil Powders in the future if the products were beneficial to health and provided the specific health benefits represented. But unless P&G is enjoined in the manner Plaintiff requests, she may not be able to reasonably determine whether the Metamucil Powders have been reformulated so that the Products are now beneficial to health or provide the promised health benefits. For example, although the type and amount of fiber in the Metamucil Powders is currently

insufficient to counteract the negative health consequences of their added sugar content, changes to the composition, processing, and manufacturing of the Metamucil Powders, not evident upon examination of the product labels, could change its effect on the body.

140.    Plaintiff would purchase the Metamucil Powders if she could trust that P&G's representations were true and not false or misleading, but absent an injunction, Plaintiff will be unable to trust the representations on the Metamucil Powders when she encounters them in the marketplace.

141.    Plaintiff's substantive right to a marketplace free of fraud, where she is entitled to rely with confidence on representations such as those made by P&G, continues to be violated every time Plaintiff is exposed to the misleading labeling claims.

142.    Plaintiff's legal remedies are inadequate to prevent these future injuries.

## CLASS ACTION ALLEGATIONS

143.    While reserving the right to redefine or amend the class definition prior to or as part of a motion seeking class certification, pursuant to Federal Rule of Civil Procedure 23, Plaintiff seeks to represent a class of all persons in the United States and/or a class or subclass of all person in California who, at any time from September 22, 2018 to the time a class is notified (the "Class Period"), purchased, for personal or household use, and not for resale or distribution, any of the Metamucil Powders (the "Class").

144.    The members in the proposed Class are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of all Class Members in a single action will provide substantial benefits to the parties and Court.

145.    Questions of law and fact common to Plaintiff and the Class include:

a.    whether the challenged statements on the Metamucil Powders are material, or likely to be material, to a reasonable consumer;

b.    whether the challenged claims are false, misleading, or reasonably likely to deceive a reasonable consumer;

c.    whether P&G's conduct violates public policy;

d.    whether P&G's conduct violates state or federal food statutes or regulations;

e.    whether P&G made and breached warranties;

f.      the proper amount of damages, including punitive damages;

g.      the proper amount of restitution;

h.      the proper scope of injunctive relief; and

i.      the proper amount of attorneys' fees.

146.    These common questions of law and fact predominate over questions that affect only individual Class Members.

147.    Plaintiff's claims are typical of Class Members' claims because they are based on the same underlying facts, events, and circumstances relating to P&G's conduct. Specifically, all Class Members, including Plaintiff, were subjected to the same misleading and deceptive conduct when they purchased the Metamucil Powders and suffered economic injury because the Products are misrepresented. Absent P&G's business practice of deceptively, unlawfully, and unfairly labeling the Metamucil Powders, Plaintiff and Class Members would not have purchased them or would have paid less for them.

148.    Plaintiff will fairly and adequately represent and protect the interests of the Class, has no interests incompatible with the interests of the Class, and has retained counsel competent and experienced in class action litigation, and specifically in litigation involving the false and misleading advertising of foods and beverages.

149.    Class treatment is superior to other options for resolution of the controversy because the relief sought for each Class Member is small, such that, absent representative litigation, it would be infeasible for Class Members to redress the wrongs done to them.

150.    P&G has acted on grounds applicable to the Class, thereby making appropriate final injunctive and declaratory relief concerning the Class as a whole.

151.    As a result of the foregoing, class treatment is appropriate under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3).

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Violations of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.***

152.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

153.    The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

154.    The acts, omissions, misrepresentations, practices, and non-disclosures of as alleged herein constitute business acts and practices.

### Fraudulent

155.    A statement or practice is fraudulent under the UCL if it is likely to deceive a significant portion of the public, applying an objective reasonable consumer test.

156.    As set forth herein, P&G's "Appetite Control," "Blood Sugar," "Digestive Health," "#1 Doctor Recommended" representations, and instructions relating to the Metamucil Powders are likely to deceive reasonable consumers and the public.

### Unlawful

157.    As set forth herein, P&G's "Appetite Control," "Blood Sugar," "Digestive Health," "#1 Doctor Recommended" representations, and instructions relating to the Metamucil Powders are "unlawful" under the UCL in that they violate at least the following laws:

- •    The False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*;
- •    The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*;
- •    The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.*; and
- •    The California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code §§ 110100 *et seq.*

### Unfair

158.    P&G's conduct with respect to the labeling, advertising, and sale of the Metamucil Powders with "Appetite Control," "Blood Sugar," "Digestive Health," "#1 Doctor Recommended" representations,

and instructions was unfair because P&G's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers, and the utility of its conduct, if any, does not outweigh the gravity of the harm to its victims.

159.    P&G's conduct with respect to the labeling, advertising, and sale of the Metamucil Powders with "Appetite Control," "Blood Sugar," "Digestive Health," "#1 Doctor Recommended" representations, and instructions was also unfair because it violates public policy as declared by specific constitutional, statutory or regulatory provisions, including but not necessarily limited to the False Advertising Law, portions of the Federal Food, Drug, and Cosmetic Act, and portions of the California Sherman Food, Drug, and Cosmetic Law.

160.    P&G's conduct with respect to the labeling, advertising, and sale of the Metamucil Powders with "Appetite Control," "Blood Sugar," "Digestive Health," "#1 Doctor Recommended" representations, and instructions was and is also unfair because the consumer injury was substantial, not outweighed by benefits to consumers or competition, and not one consumers themselves could reasonably have avoided. Specifically, the increase in profits obtained by P&G through the misleading labeling does not outweigh the harm to Class Members who were deceived into purchasing the Metamucil Powders believing they provide the claimed benefits when in fact they do not provide the claimed benefits and are of the type that is likely to detriment health. Consumers could not have reasonably avoided the harm because this would have required that they conduct their own research into the health effects of consuming the Metamucil Powders, which is not a reasonable expectation. Further, the harm could have easily been avoided by P&G as it would have cost them nothing to not place the challenged claims on the Products' labels.

161.    P&G profited from the sale of the falsely, deceptively, and unlawfully advertised the Metamucil Powders to unwary consumers.

162.    Plaintiff and Class Members are likely to continue to be damaged by P&G's deceptive trade practices, because P&G continues to disseminate misleading information. Thus, injunctive relief enjoining P&G's deceptive practices is proper.

163.    P&G's conduct caused and continues to cause substantial injury to Plaintiff and other Class Members. Plaintiff has suffered injury in fact as a result of P&G's unlawful conduct.

164. In accordance with Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining P&G from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices.

165. Plaintiff and the Class also seek an order for the restitution of all monies from the sale of the Metamucil Powders, which were unjustly acquired through acts of unlawful competition.

166. Because Plaintiff's claims under the "unfair" prong of the UCL sweep more broadly than her claims under the FAL, CLRA, or UCL's "fraudulent" prong, Plaintiff's legal remedies are inadequate to fully compensate her for all of P&G's challenged behavior.

## SECOND CAUSE OF ACTION

### Violations of the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*

167. Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

168. The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

169. It is also unlawful under the FAL to disseminate statements concerning property or services that are "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id*.

170. As alleged herein, the advertisements, labeling, policies, acts, and practices of P&G relating to the Metamucil Powders were likely to mislead consumers acting reasonably, as to the effects of consuming the Products on appetite control, blood sugar, and digestive health.

171. Plaintiff suffered injury in fact as a result of P&G's actions as set forth herein because she purchased the Metamucil Powders in reliance on P&G's false and misleading marketing claims stating or suggesting that the Metamucil Powders help support healthy blood sugar levels, appetite control, and digestive health, and are doctor recommended.

172.     P&G's business practices as alleged herein constitute unfair, deceptive, untrue, and misleading advertising pursuant to the FAL because P&G has advertised the Metamucil Powders in a manner that is untrue and misleading, which P&G knew or reasonably should have known, and omitted material information from the Metamucil Powders' labeling.

173.     P&G profited from the sale of the falsely and deceptively advertised Metamucil Powders to unwary consumers.

174.     As a result, Plaintiff, the Class, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which P&G was unjustly enriched.

175.     Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiff, on behalf of herself and the Class, seek an order enjoining P&G from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth in this Complaint.

176.     Because the Court has broad discretion to award restitution under the FAL and could, when assessing restitution under the FAL, apply a standard different than that applied to assessing damages under the CLRA or commercial code (for Plaintiff's breach of warranty claims), and restitution is not limited to returning to Plaintiff and Class Members monies in which they have an interest, but more broadly serves to deter the offender and others from future violations, the legal remedies available under the CLRA and commercial code are more limited than the equitable remedies available under the FAL, and are therefore inadequate.

### THIRD CAUSE OF ACTION

### Violations of the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*

177.     Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

178.     The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

179.     P&G's false and misleading labeling and other policies, acts, and practices were designed to, and did, induce the purchase and use of the Metamucil Powders for personal, family, or household purposes by Plaintiff and Class Members, and violated and continue to violate the following sections of the CLRA:

a.      § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

b.      § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another;

c.      § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

d.      § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

180.    P&G profited from the sale of the falsely, deceptively, and unlawfully advertised Metamucil Powders to unwary consumers.

181.    P&G's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA.

182.    Pursuant to California Civil Code § 1782, more than 30 days before filing this lawsuit, Plaintiff sent written notice of her claims and P&G's particular violations of the Act to P&G by certified mail, return receipt requested, but P&G has failed to implement remedial measures.

183.    As a result, Plaintiff and the Class have suffered harm, and therefore seek (a) actual damages resulting from purchases of the Metamucil Powders sold throughout the Class Period to all Class Members, (b) punitive damages, (c) injunctive relief in the form of modified advertising, (d) restitution, and (e) attorneys' fees and costs.  *See* Cal. Civ. Code § 1782(d).

184.    In compliance with Cal. Civ. Code § 1780(d), an affidavit of venue is filed concurrently herewith.

**FOURTH CAUSE OF ACTION**

**Breaches of Express Warranties, Cal. Com. Code § 2313(1)**

185.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

186.    Through the Metamucil Powders' labeling, P&G made affirmations of fact or promises, or description of goods, that, *inter alia*, the products are beneficial to health and are doctor recommended, and

provide the specific health benefits of helping support appetite control, healthy blood sugar levels, and digestive health.

187.    These affirmations and descriptions include: "Helps Support: Appetite Control[,] . . . Healthy Blood Sugar Levels[, and] Digestive Health," "#1 Doctor Recommended Brand," and instructions for use.

188.    These representations were "part of the basis of the bargain," in that Plaintiff and the Class purchased the Metamucil Powders in reasonable reliance on those statements. Cal. Com. Code § 2313(1).

189.    P&G breached its express warranties by selling Metamucil Powders that that do not meet the above affirmations, promises, and product descriptions because consumption of the Metamucil Powders is likely to adversely affect appetite control, blood sugar levels, and digestive health, and is overall detrimental rather than beneficial to health.

190.    That breach actually and proximately caused injury in the form of the lost purchase price that Plaintiff and Class Members paid for the Metamucil Powders.

191.    As a result, Plaintiff seeks, on behalf of herself and other Class Members, actual damages arising as a result of P&G's breaches of express warranty, including, without limitation, expectation damages.

## FIFTH CAUSE OF ACTION

### Breach of Implied Warranty of Merchantability, Cal. Com. Code § 2314

192.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

193.    P&G, through its acts set forth herein, in the sale, marketing, and promotion of the Metamucil Powders, made representations to Plaintiff and the Class that, among other things, the Metamucil Powders are beneficial to health and are doctor recommended, and provide the specific health benefits of helping support appetite control, healthy blood sugar levels, and digestive health.

194.    P&G is a merchant with respect to the goods of this kind which were sold to Plaintiff and the Class, and there were, in the sale to Plaintiff and the Class, implied warranties that those goods were merchantable.

195.    However, P&G breached that implied warranty in that the Metamucil Powders are not beneficial to health but are of the type that are generally harmful to health, as set forth in detail herein.

196.    As an actual and proximate result of P&G's conduct, Plaintiff and the Class did not receive goods as impliedly warranted by P&G to be merchantable in that they did not conform to promises and affirmations made on the container or label of the goods.

197.    As a result, Plaintiff seeks actual damages, including, without limitation, expectation damages.

## SIXTH CAUSE OF ACTION

### Unjust Enrichment

198.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

199.    Plaintiff and Class Members conferred upon P&G an economic benefit, in the form of profits resulting from the purchase and sale of the Metamucil Powders.

200.    P&G's financial benefits resulting from its unlawful and inequitable conduct are economically traceable to Plaintiff's and Class Members' purchases of the Metamucil Powders and the economic benefits conferred on P&G are a direct and proximate result of its unlawful and inequitable conduct.

201.    It would be inequitable, unconscionable, and unjust for P&G to be permitted to retain these economic benefits because the benefits were procured as a direct and proximate result of its wrongful conduct.

202.    As a result, Plaintiff and Class Members are entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits which may have been obtained by P&G as a result of such business practices.

## SEVENTH CAUSE OF ACTION

### Negligent Misrepresentation

203.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

204.    P&G marketed the Metamucil Powders in a manner conveying to reasonable consumers that the Products promote general health and wellness, and provide specific health benefits, like appetite control, healthy blood sugar levels, and digestive health.

205.    In marketing the Metamucil Powders, P&G held itself out as an expert on health and fiber powders generally, as well as on digestive health, maintaining healthy blood sugar levels, and appetite control, among other things.[97]

206.    P&G's misrepresentations regarding the Metamucil Powders are material to a reasonable consumer because they relate to human health, both generally and specifically to appetite control, healthy blood sugar levels, and digestive health. Reasonable consumers would attach importance to such representations and would be induced to act thereon in making purchase decisions.

207.    In selling the Metamucil Powders, P&G acted in the ordinary course of its business and had a pecuniary interest in Plaintiff and Class Members purchasing the Metamucil Powders.

208.    P&G owed a duty of care to Plaintiff not to provide her false information when she was making her purchase decisions regarding the Metamucil Powders.

209.    P&G knew or had been negligent in not knowing that the Metamucil Powders did not promote health, but instead, consuming sugar sweetened beverages, like those made from the Metamucil Powders, harms rather than supports the overall health of the average consumer and harms rather than supports appetite control, blood sugar levels, and digestive health in particular. P&G had no reasonable grounds for believing its misrepresentations were not false and misleading.

210.    P&G intends that Plaintiff and other consumers rely on these representations, as evidenced by the intentional and conspicuous placement of the misleading representations on the Metamucil Powders' packaging by P&G.

211.    Plaintiff and Class Members have reasonably and justifiably relied on P&G's misrepresentations when purchasing the Metamucil Powders, and had the correct facts been known, would

---

[97] *See, e.g.*, https://us.pg.com/product-safety/ ("For over 181 years, your safety and the safety of your world has been at the heart of what we do. That's why we have a team of more than 500 scientists and professionals and a rigorous safety process to analyze every ingredient—before we ever consider putting it in one of our products.").

1    not have purchased them at the prices at which they were offered.

2    212.   Therefore, as a direct and proximate result of P&G's negligent misrepresentations, Plaintiff

3    and Class Members have suffered economic losses and other general and specific damages, in the amount

4    of the Metamucil Powders' purchase prices, or some portion thereof, and any interest that would have

5    accrued on those monies, all in an amount to be proven at trial.

6                              **EIGHTH CAUSE OF ACTION**

7                              **Intentional Misrepresentation**

8    213.   Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth

9    in full herein.

10   214.   P&G marketed the Metamucil Powders in a manner conveying to reasonable consumers that

11   the Products promote general health and wellness, as well as providing specific health benefits, like

12   supporting immune, heart, and digestive health. However, consuming sugar sweetened beverages like those

13   made from the Metamucil Powders harms, rather than supports the overall health of the average consumer

14   and harms rather than supports appetite control, blood sugar levels, and digestive health. Therefore, P&G

15   has made misrepresentations about the Metamucil Powders.

16   215.   P&G's misrepresentations regarding the Metamucil Powders are material to a reasonable

17   consumer because they relate to human health, both generally and specifically to appetite control, healthy

18   blood sugar levels, and digestive health. A reasonable consumer would attach importance to such

19   representations and would be induced to act thereon in making purchase decisions.

20   216.   At all relevant times, P&G knew that the misrepresentations were misleading, or has acted

21   recklessly in making the misrepresentations, without regard to their truth.

22   217.   P&G intends that Plaintiff and other consumers rely on these misrepresentations, as

23   evidenced by the intentional and conspicuous placement of the misleading representations on the Metamucil

24   Powders' packaging by P&G.

25   218.   Plaintiff and members of the Class have reasonably and justifiably relied on P&G's

26   intentional misrepresentations when purchasing the Metamucil Powders; had the correct facts been known,

27   they would not have purchased the Products at the prices at which the Products were offered.

28

219.    Therefore, as a direct and proximate result of P&G's intentional misrepresentations, Plaintiff and Class Members have suffered economic losses and other general and specific damages, in the amount of the Metamucil Powders' purchase prices, or some portion thereof, and any interest that would have accrued on those monies, all in an amount to be proven at trial.

## PRAYER FOR RELIEF

220.    Wherefore, Plaintiff, on behalf of herself, all others similarly situated, and the general public, prays for judgment against P&G as to each and every cause of action, and the following remedies:

a.    An Order declaring this action to be a proper class action, appointing Plaintiff as Class Representative, and appointing Plaintiff's undersigned counsel as Class Counsel;

b.    An Order requiring P&G to bear the cost of Class Notice;

c.    An Order compelling P&G to destroy all misleading and deceptive advertising materials and product labels, and to recall all offending products;

d.    An Order requiring P&G to disgorge all monies, revenues, and profits obtained by means of any wrongful act or practice;

e.    An Order requiring P&G to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, or untrue or misleading advertising, plus pre-and post-judgment interest thereon;

f.    An Order requiring P&G to pay compensatory and punitive damages as permitted by law;

g.    An award of attorneys' fees and costs; and

h.    Any other and further relief that Court deems necessary, just, or proper.

## JURY DEMAND

221.    Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: January 13, 2023            /s/ Melanie Persinger
                                **FITZGERALD JOSEPH LLP**
                                JACK FITZGERALD
                                *jack@fitzgeraldjoseph.com*
                                PAUL K. JOSEPH
                                *paul@fitzgeraldjoseph.com*

47

MELANIE PERSINGER
*melanie@fitzgeraldjoseph.com*
TREVOR M. FLYNN
*trevor@fitzgeraldjoseph.com*
CAROLINE S. EMHARDT
*caroline@fitzgeraldjoseph.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741

**Counsel for Plaintiff**