United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

TARA AMADO,

Plaintiff,

v.

THE PROCTER & GAMBLE CO.,

Defendant.

Case No. 22-cv-05427-MMC

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT; AFFORDING PLAINTIFF LEAVE TO AMEND**

Before the Court is defendant Proctor & Gamble Co.'s ("P&G") motion, filed March 10, 2023, "to Dismiss Second Amended Complaint." Plaintiffs Tara Amado and Regina Pellegrino have filed opposition, to which P&G has replied. Having read and considered the papers filed in support of and in opposition to the motion, the Court rules as follows.[1]

**BACKGROUND[2]**

P&G "sells a variety of products under the Metamucil brand name," including psyllium fiber powders. (See SAC ¶ 11.) "The Metamucil powders challenged in this lawsuit include those varieties of Metamucil that contain added sugar, namely, Metamucil's Unflavored and Orange Flavored Fiber Powders" (hereinafter, "the Products"). (See SAC ¶ 11 n.1).

The front labels of the Products state, in relevant part, "4-in-1 Fiber Helps Support:

[1] By order filed April 25, 2023, the Court took the matter under submission.

[2] The following facts are taken from the allegations of the operative complaint, the "Second Amended Complaint for Consumer Fraud, Breach of Express & Implied Warranties, Negligent and Intentional Misrepresentation, and Unjust Enrichment" ("SAC").

United States District Court
Northern District of California

Appetite Control[;] Heart Health by Lowering Cholesterol[;][3] Healthy Blood Sugar Levels[;] and Digestive Health" (hereinafter, "Front Label Statements"). (See Request for Incorporation by Reference and Judicial Notice in Supp. of Def.'s Mot. to Dismiss ("RJN") Exs. 31-32, Dkt. Nos. 26-32; 26-33.)[4] The back labels tout the same health benefits as the front labels; in particular, the back labels state, in relevant part, "[t]he psyllium husk fiber in Metamucil helps support: Digestive Health by promoting regularity[;] Heart Health by lowering cholesterol[;] Healthy Blood Sugar Levels[;] and Appetite Control" (hereinafter, "Back Label Statements"). (See RJN Exs. 31-32.)[5] The back labels also provide directions as to "how much to take." (See RJN Exs. 31-32.) For consumers of the unflavored product, the recommended amount for "Healthy Blood Sugar Levels" and "Digestive Health" is "1 rounded teaspoon up to 3 times per day," and for "Appetite Control" is "2 rounded teaspoons up to three times per day." (See RJN Ex. 32.) For consumers of the orange flavored product, the recommended amount for "Healthy Blood Sugar Levels" and "Digestive Health" is "1 rounded tablespoon up to 3 times per day," and for "Appetite Control" is "2 rounded tablespoons up to three times per day." (See RJN Ex. 31).[6] The side labels state, in relevant part, "#1 Doctor Recommended Brand"

---

[3] The "Helps Support . . . Heart Health by Lowering Cholesterol" representation is not a basis for plaintiffs' claims in the instant action. (See SAC ¶ 12 n.2.)

[4] Defendants' unopposed request that the Court consider the Products' labels as incorporated by reference in the SAC is hereby GRANTED. See Branch v. Tunnell,14 F.3d 449, 454 (9th Cir. 1994) (holding "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss" without "convert[ing] the motion to dismiss into a motion for summary judgment").

[5] Beneath "Healthy Blood Sugar Levels" and "Appetite Control," the labels include the directive "take before each meal[.]" (See RJN Exs. 31-32.)

[6] Assuming the above instructions are followed, purchasers of the unflavored product would consume, for "Healthy Blood Sugar Levels" or "Digestive Health," 4 grams of sugar per serving, i.e., up to 12 grams of sugar per day, and for "Appetite Control," 7 grams of sugar per serving, i.e., up to 21 grams of sugar per day (see RJN Ex. 32); purchasers of the orange flavored product would consume, for "Healthy Blood Sugar Levels" or "Digestive Health," 8 grams of sugar per serving, i.e., up to 24 grams of sugar per day, and for "Appetite Control," 16 grams of sugar per serving, i.e., up to 48 grams of

United States District Court
Northern District of California

(hereinafter, "Side Label Statement"). (See SAC ¶ 13.)

Plaintiffs purchased the Products while "seeking a fiber powder that would provide benefits related to healthy blood sugar levels, appetite control, and digestive health." (See SAC ¶ 130).[7] "In purchasing the [Products], [p]laintiffs were exposed to, read, and relied on" the Front and Back Label Statements, which statements "communicated to them that [the Products] would provide these benefits and [were] generally healthy to consume[.]" (See SAC ¶ 130.) According to plaintiffs, the Front and Back Label Statements are "false or at least highly misleading because compelling scientific evidence demonstrates that the Metamucil Powders–due to their added sugar content–actually decrease appetite control, harm blood sugar levels, and damage digestive health." (See SAC ¶ 2.)

Based on the above, plaintiffs assert, on their own behalf and on behalf of a putative class and two subclasses,[8] the following ten Causes of Action: (1) "Violation of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq." ("UCL"); (2) "Violations of the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 et seq." ("FAL"); (3) "Violations of the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 et seq." ("CLRA"); (4) "Breach of Express Warranties, Cal. Com. Code § 2313(1)"; (5) "Breach of Implied Warranty of Merchantability, Cal. Com. Code § 2314"; (6) "Unfair and Deceptive Business Practices, N.Y. Gen. Bus. L. § 349" ("GBL § 349"); (7) "False

---

sugar per day (see RJN Ex. 31).

[7] Plaintiff Amado "purchased orange flavored Metamucil made with real sugar . . . starting, approximately, in late 2017 or early 2018, with her last purchase in early 2022," and "would often make her purchases from stores such as CVS, Target, and Walgreens in San Bruno, California." (See SAC ¶ 128.) Plaintiff Regina Pellegrino "purchased orange flavored Metamucil made with real sugar . . . starting, approximately, in early 2020, with her last purchase[] in approximately mid- to late 2022" and "usually made her purchases from CVS in Thornwood, New York." (See SAC ¶ 129.)

[8] Plaintiffs seek to represent a class of "all persons in the United States, and separately Subclasses of all persons in California and New York, who, at any time from September 22, 2018[,] to the time a class is notified (the 'Class Period'), purchased, for personal or household use, and not for resale or distribution, any of the Metamucil Powders[.]" (See SAC ¶ 145.)

Advertising, N.Y. Gen. Bus. L. § 350" ("GBL § 350"); (8) "Unjust Enrichment"; (9) "Negligent Misrepresentation"; and (10) "Intentional Misrepresentation."[9]

**LEGAL STANDARD**

Dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure "can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." See Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990). Rule 8(a)(2), however, "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)). Consequently, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." See id. Nonetheless, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than . . . a formulaic recitation of the elements of a cause of action." See id. (internal quotation, citation, and alteration omitted).

In analyzing a motion to dismiss, a district court must accept as true all material allegations in the complaint and construe them in the light most favorable to the nonmoving party. See NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986). "To survive a motion to dismiss," however, "a complaint must contain sufficient factual material, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). "Factual allegations must be enough to raise a right to relief above the speculative level," Twombly, 550 U.S. at 555, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation," see Iqbal, 556 U.S. at 678 (internal quotation and citation omitted).

/ /

[9] The First through Fifth Causes of Action are brought on behalf of the California Subclass, and the Sixth and Seventh Causes of Action are brought on behalf of the New York Subclass. The SAC does not specify whether the remaining causes of action are brought on behalf of the California Subclass, New York Subclass, or both.

**DISCUSSION**

By the instant motion, P&G seeks an order dismissing each of plaintiffs' causes of action, on grounds of, inter alia, preemption and failure to plead falsity. The Court considers, in turn, each of the above arguments.

**A. Preemption**

P&G first contends plaintiffs' claims are expressly preempted by the federal Food, Drug, and Cosmetic Act ("FDCA"). (See Def.'s Mot to Dismiss Second Am. Compl. ("Mot.") 6:19, Dkt. No. 25.)

"Federal preemption occurs when: (1) Congress enacts a statute that explicitly pre-empts state law; (2) state law actually conflicts with federal law; or (3) federal law occupies a legislative field to such an extent that it is reasonable to conclude that Congress left no room for state regulation in that field." Chae v. SLM Corp., 593 F.3d 936, 941 (9th Cir. 2010) (internal quotation and citation omitted).

Here, as noted, P&G cites to the FDCA, which statute Congress enacted in 1938 "to 'promote the public health' by ensuring that 'foods are safe, wholesome, sanitary, and properly labeled.'" See Kroessler v. CVS Health Corp., 977 F.3d 803, 808 (9th Cir. 2020) (quoting 21 U.S.C. § 393(b)(2)(A)). "In 1990, Congress amended the FDCA with the Nutrition Labeling and Education Act ('NLEA'), 21 U.S.C. § 343 et seq.," and, in 1994, "further amended the FDCA with the Dietary Supplement Health and Education Act ('DSHEA'), Pub. L. No. 103-417, 108 Stat. 4325," which statute, together with the NLEA, "established a new category of food products–specifically, dietary supplements–that have unique safety, labeling, manufacturing, and other related standards." See id. "Private plaintiffs may not bring actions to enforce violations of the FDCA," but "may bring analogous state law claims as long as the FDCA does not preempt those claims." See id.

The FDCA expressly preempts any state law that establishes "any requirement respecting any claim of the type described in section 343(r)(10) of [Title 21] made in the label or labeling of food that is not identical to the requirement of section 343(r) of [Title

21].” See 21 U.S.C. § 343-1(a)(5). A state law claim is “not identical to” federal law if it “directly or indirectly imposes obligations or contains provisions concerning the composition or labeling of food, or concerning a food container, that: (i) [a]re not imposed by or contained in the applicable provision . . . or (ii) [d]iffer from those specifically imposed by or contained in the applicable provision.” See 21 C.F.R. § 100.1(c)(4). Significantly, “§ 343-1(a)(5) preempts state-law requirements for claims about dietary supplements that differ from the FDCA's requirements.” See Dachauer v. NBTY, Inc., 913 F.3d 844, 848 (9th Cir. 2019).

In the instant case, plaintiffs, as set forth above, bring claims both under California law, namely, violations of the UCL, FAL, CLRA, and breach of express and implied warranties, and under New York law, namely, violations of GBL §§ 349-350, as well as derivative common law claims. The UCL bars “unfair competition,” which term is defined as any “business act or practice” that is (1) “fraudulent,” (2) “unlawful,” or (3) “unfair.” See Cal. Bus. & Prof. Code, § 17200. The FAL prohibits the use of “any advertising device . . . which is untrue or misleading.” See Cal. Bus. & Prof. Code § 17500. The CLRA defines various “unfair methods of competition and unfair or deceptive acts or practices,” such as “[r]epresenting that goods . . . have . . . characteristics [or] . . . benefits . . . that they do not have,” see Cal. Civ. Code § 1770(a)(5), “[r]epresenting that goods . . . are of a particular standard, quality, or grade . . . if they are of another,” see Cal. Civ. Code § 1770(a)(7), and “[a]dvertising goods or services with intent not to sell them as advertised,” see Cal. Civ. Code § 1770(a)(9). GBL § 349 provides a cause of action for any person injured by “[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service,” see N.Y. Gen. Bus. Law § 349(a), (h), and GBL § 350 prohibits “[f]alse advertising in the conduct of any business, trade, or commerce,” see N.Y. Gen. Bus. Law § 350.

Plaintiffs allege P&G violated California and New York law by selling the Products with false and misleading labels. In particular, plaintiffs allege the Products’ labels are false and misleading because they (1) affirmatively state the Products can provide health

benefits that they cannot provide due to the presence of sugar; (2) omit material facts regarding the effects of consuming sugar on said health benefits; and (3) fail to warn of the risks associated with sugar consumption.

As long as the California and New York laws under which plaintiffs seek relief impose requirements identical to the FDCA, the FDCA will not preempt plaintiffs' state law causes of action. See Kroessler, 977 F.3d at 809. The Court next considers P&G's preemption defense as it applies to plaintiffs' affirmative misstatement, omission, and failure to warn theories.

**1. Affirmative Misstatements**

At the outset, P&G asserts plaintiffs' causes of action, to the extent based on the Front and Back Label Statements, are preempted, "because they seek to challenge structure/function claims about fiber that are expressly permitted by the FDCA." (See Mot. 8:6-7.)

The FDCA defines two categories of permissible label statements on dietary supplements: "product-specific 'disease' claims and nutrient-specific 'structure/function' claims.'" See Ferrari v. Viatim Shoppe, Inc., 2022 WL 974048, at *3 (D. Mass. Mar. 31, 2022) (quoting Kroessler, 977 F.3d at 809). "Health-related statements that do not fall into those categories are prohibited as false or misleading." See id. (internal quotation and citation omitted).

A disease claim purports "to diagnose, mitigate, treat, cure, or prevent disease," either explicitly or implicitly. See 21 C.F.R. § 101.93(g)(2); see also 21 U.S.C. § 343(r)(6); Regulations on Statements Made for Dietary Supplements Concerning the Effect of the Product on the Structure or Function of the Body, 65 Fed. Reg. 10000-01, 1012 (Jan. 6, 2000) (providing "[i]mplied disease claims do not mention the name of a specific disease, but refer to identifiable characteristics of a disease from which the disease itself may be inferred").

A structure function claim, by contrast, "describes the role of a nutrient or dietary ingredient intended to affect the structure or function in humans," or "characterizes the

documented mechanism by which a nutrient or dietary ingredient acts to maintain such structure or function," see 21 U.S.C. § 343(r)(6)(A), but "may not claim to diagnose, mitigate, treat, cure, or prevent a specific disease or class of diseases," see 21 U.S.C. § 343(r)(6). The Ninth Circuit has held such claims must be "narrowly focused" in that they "refer[] to [an] ingredient's general rule in the human body, not the product's impact on a person's health," see Greenberg v. Target, 985 F.3d 650, 654-55 (9th Cir. 2021), and typically "use broad general verbs such as 'improve,' 'promote,' 'regulate,' and 'support' to describe the properties of a nutrient, rather than promising specific results," see Ferrari, 2022 WL 974048, at *4 (citing 65 Fed. Reg. at 1011).

"Structure/function claims must meet three requirements: (1) the manufacturer has substantiation that the statement is truthful and not misleading; (2) the statement contains a prominent disclaimer that the FDA has not evaluated the statement and that the product 'is not intended to diagnose, treat, cure, or prevent any disease'; and (3) the statement itself does not 'claim to diagnose, mitigate, treat, cure, or prevent' disease." See Kroessler, 997 F.3d at 809 (quoting 21 U.S.C. § 343(r)(6)(C)). "[A]s long as a dietary supplement manufacturer meets these requirements, it may assert structure/function claims without pre-approval from a federal agency." See id.[10] In practice, this means "a manufacturer may place a broad statement about the general effect of a dietary supplement ingredient on a supplement label, even if the dosage of the supplement in the product may not actually produce the described result." See Ferrari, 2022 WL 974048, at *3 (holding "[t]he statement need only be literally true as a general statement to be eligible for legitimate inclusion on a supplement label without FDA preclearance").

Here, P&G argues, "the label of Metamucil makes clear" that the Front and Back Label Statements "refer[] to the benefits of psyllium fiber on the human body" (see Mot.

---

[10] "A dietary supplement manufacturer making only structure/function claims regarding its supplement must notify the Office of Nutritional Products, Labeling, and Dietary Supplements in the FDA." See Kroessler, 977 F.3d at 809 (citing 21 C.F.R. § 101.93(a)).

8:7-9), thus rendering it a permissible structure/function claim. In response, plaintiffs assert "the challenged claims convey that the Metamucil Powders as a whole will provide the promised health benefits," and, consequently, "do not qualify as structure/function claims because they are not limited, as they must be, to 'describing the role of a nutrient or dietary ingredient.'" (See Pltfs.' Opp'n to Def.'s Mot. to Dismiss ("Opp.") 7:18-20, Dkt. No. 27 (quoting 21 C.F.R. § 101.93(f)) (emphasis added).) The Court, as set forth below, agrees with P&G.

        The Front Label Statements on the Products are positioned beneath a heading in large, white print, which heading states "4-in-1 Fiber," and a sub-heading in smaller, orange print, which heading states "Helps Support[.]" (See RJN Exs. 31-32.) The heading, sub-heading, and Front Label Statements are presented on a vertical purple banner distinct from a bright orange circle containing the name of the Products, "Metamucil – Psyllium Fiber Supplement." (See RJN Exs. 31-32.) Read in the context of the Products' labels, the Front Label Statements are "limited in scope and tone," in that they "describe generally the potential impact of a specific ingredient," namely, fiber, and "make no promises about the supplement's actual efficacy in the product." See Ferrari, 2022 WL 974048, at *4. The Back Label Statements are similarly circumscribed. In particular, the Back Label Statements are positioned beneath a heading stating "How Much to Take," and sub-heading stating "[t]he psyllium husk fiber in Metamucil helps support: . . ." (See RJN Exs. 31-32.) Under such circumstances, the Court finds the Front and Back Label Statements sufficiently narrow to qualify as structure/function claims.

        Nevertheless, plaintiffs argue, the Front Label Statements are followed by the statement "Made with Real Sugar," and, according to plaintiffs, a "reasonable consumer could thus believe . . . that it is the pictured Metamucil products in their entirety, including both the 'FIBER' and 'REAL SUGAR,' that would deliver the promised benefits." (See Opp. 6:25-7:7.) The Court is not persuaded. Although the challenged statements are positioned between the statements "4-in-1 Fiber" and "Made with Real Sugar," the latter

is clearly set off from the above-described vertical purple banner by a horizontal, yellow banner, and the type size and colors of the two banners are markedly different. Moreover, the phrase "Made with Real Sugar" is a stand-alone representation, unlike the Front Label Statements, which only form representations with read in the context of the preceding headings and sub-headings.

Plaintiffs next argue that P&G markets the challenged Metamucil products "as laxatives," thereby "rendering them unapproved new drugs."  (See Opp. 8:16-17.)  In so arguing, plaintiffs appear to suggest that the marketing and advertising of Metamucil contains implied disease claims. (See Opp. 8:7-9 (pointing out that "many courts have considered extra-label material when identifying implied disease claims, including the product's advertisements, the consumer's experience with the product, and market research showing consumer's typical uses of the product" (internal quotation and citation omitted)).)

In support thereof, plaintiffs first point to the Back Label Statements, wherein P&G advises consumers on "How Much to Take" to "support," among other things, "Digestive Health[] by promoting regularity" (see SAC ¶ 114), and warns customers that they "may experience changes in bowel habits" and to "Stop Using . . . if constipation lasts more than 7 days" (see SAC ¶ 115).  Additionally, plaintiffs point to statements on Metamucil's website, which contains an "entire section of articles dedicated to the topic of 'Constipation', including about 'Occasional Constipation 101: Causes, Symptoms and Treatments" (see SAC ¶ 117; see also Opp. 9:2-6.)  The Court is again unpersuaded.

Although the Ninth Circuit has held district courts, when determining whether certain advertising is an implied disease claim, may consider not only the labels themselves, but also "extra-label material," see Kroessler, 977 F.3d at 815, the FDA has addressed whether "regularity" or "constipation" claims should be viewed as disease claims requiring FDA approval, and decided not to include "occasional constipation" as a disease under the FDCA; it has further concluded that statements such as "helps maintain regularity" and "helps promote digestion" are "examples of acceptable

structure/function claims." See 65 Fed. Reg. at 1,006, 1,015. The statements challenged here are essentially the same as the above statements the FDA has deemed acceptable structure/function claims, and the Court will defer to the FDA's interpretation of its own rules. See PLIVA, Inc. v. Mensing, 564 U.S. 604, 604 (2011) (deferring to the FDA's views "because they are not plainly erroneous or inconsistent with the regulations, and there is no other reason to doubt that they reflect the FDA's fair and considered judgment"); see also United States v. Bayer Corp., 2015 WL 5822595, at *5 (D.N.J. Sep. 24, 2015) (finding such statements as "promote overall digestive health" and "helps defend against occasional constipation" properly "categorized as structure function claims under FDA regulations").[11]

Having determined the Front and Back Label Statements are sufficiently narrow to qualify as structure/function claims, in that they pertain to the effects of fiber rather than to the Products generally, and do not purport to have any effect on disease, the Court considers whether such statements satisfy the remaining requirements for structure/function claims, namely, whether "(1) the manufacturer has substantiation that the statement[s] [are] truthful and not misleading; (2) the statements contain[] a prominent disclaimer that the FDA has not evaluated the statement and that the product 'is not intended to diagnose, treat, cure, or prevent any disease[.]'" See Kroessler, 997

---

[11] Plaintiffs' reliance on Corbett v. PharmaCare U.S., Inc., 567 F. Supp. 3d 1172 (S.D. Cal. 2021) and Hughes v. Ester C. Co., 99 F. Supp. 3d 278 (E.D.N.Y. 2015) is unavailing. In both cases, the court found that although the challenged label statements, standing alone, qualified as valid structure/function claims, such claims, when read in the context of other statements on the products' labels and extra-label statements, "impl[ied] that the [p]roducts could treat, cure, or prevent disease." See Corbett, 567 F. Supp. 3d at 1191-1192 (noting advertising of products as "scientifically tested" and "virologist developed" necessarily "impl[ied] the [p]roducts are preventing disease because a virologist is an expert that deals with viruses and the disease they cause"; further noting statement on defendant's website that product's primary ingredient is "used in traditional remedies for colds, coughs, and upper respiratory infections" (internal quotations omitted)); see also Hughes, 99 F. Supp. 3d at 285 (noting statement that "Ester C provides your body with the immune and antioxidant support it needs to help keep you healthy and strong during times of seasonal change and the stresses of daily living[,]" rendered challenged statement, that product offered "immune support," an implied disease claim). Here, by contrast, the label and extra-label statements upon which plaintiffs rely have been explicitly categorized by the FDA as structure/function claims.

F.3d at 809 (quoting 21 U.S.C. § 343(r)(6)(C)).

First, there appears to be no dispute that the Products' labels contain the requisite disclaimer. Next, to the extent the statements are, as discussed above, construed as limited to the benefits of fiber, there can be no real dispute that the statements are substantiated. Indeed, the claimed benefits are essentially the same as those listed on the Center for Disease Control's webpage. See Fiber: The Carb that Helps You Manage Diabetes, Center for Disease Control, https://www.cdc.gov/diabetes/library/features/role-of-fiber.html (last visited 6/7/2023) (noting "fiber can help: [c]ontrol your blood sugar . . . [m]aintain your digestive health . . . [and] [k]eep you feeling full"); see also Fed. R. Civ. P. 201(c)(1); (b)(2) (providing court "may take judicial notice on its own" of facts that "can be accurately and reasonably determined from sources whose accuracy cannot reasonably be questioned").

Accordingly, plaintiffs' causes of action, to the extent predicated on the Front and Back Label Statements, are subject to dismissal as preempted.

**2. Omission/Failure to Warn**

Next, P&G asserts plaintiffs' causes of action, to the extent based on the alleged "omi[ssion] [of] material facts regarding the effects of consuming sugar on blood sugar, appetite control, and digestive health" (see SAC ¶¶ 95, 102), or a failure to warn consumers of the risks associated with sugar consumption (see SAC ¶¶ 125-126), likewise are preempted.

In particular, plaintiffs allege P&G, "[w]hile representing that the Metamucil Powders help support healthy blood sugar levels, appetite control, and digestive health . . . regularly and intentionally omits material information regarding the countervailing detrimental effects of the added sugars in the Metamucil Powders on blood sugar levels, appetite control, and digestive health" (see SAC ¶ 102), and that P&G "is under a duty to disclose this information" to consumers (see SAC ¶¶ 103-105; see also SAC ¶¶ 125-126). Such warnings, however, are not required under the FDCA. See 21 C.F.R. § 101.17; see Truxel v. General Mills Sales, Inc., 2019 WL 3940956, at *4 (N.D. Cal. Aug.

3, 2019) (holding, where "label plainly discloses the amount of sugar in the product," defendant food manufacturer "is under no obligation to warn . . . consumers that certain levels of sugar may be associated with poor health results"; further noting "federal express preemption bars that demand as federal law for the disclosure of sugar content in food imposes no such requirement").

Accordingly, given that plaintiffs seek to impose on P&G labeling requirements that do not exist under federal law, plaintiffs' causes of action, to the extent predicated on P&G's alleged omissions or failure to warn of the negative effects of sugar, are subject to dismissal as preempted.

**B. False or Misleading Statement**

P&G contends plaintiffs' causes of action are subject to dismissal for the additional reason that plaintiffs have failed to plead any false or misleading statement.

**1. Front and Back Label Statements**

Assuming, arguendo, that the Front and Back Label Statements on the Products are, as plaintiffs argue, statements regarding the benefits of Metamucil as a complete product, rather than fiber specifically, plaintiffs, in order to prevail on their causes of action, nonetheless must allege facts showing such statements could mislead a reasonable consumer. See Horti v. Nestle HealthCare Nutrition, Inc., 2022 WL 2441560, at *7-9 (dismissing UCL, FAL, CLRA, GBL §§ 349-350, and express warranty claims; noting "[u]nder the consumer protection laws of California and New York, claims based on deceptive or misleading marketing must demonstrate that a reasonable consumer is likely to be misled by the representation" (internal quotation, citation, and alteration omitted)); Correia v. Johnson & Johnson Consumer Inc., 2019 WL 2120967, at *3 (C.D. Cal. May 9, 2019) (holding "objectively false or misleading statement" is "element of" intentional and negligent misrepresentation claims); Cimoli v. Alacer Corp., 546 F.Supp.3d 897, 905 (N.D. Cal. 2021) (finding, where express and implied warranty claims were predicated on the same alleged "affirmation of fact or promise," implied warranty

United States District Court
Northern District of California

claim "rises and falls" with express warranty claim").[12]

In that regard, plaintiffs allege "P&G's 'Appetite Control,' 'Blood Sugar,' and 'Digestive Health' representations are false or at least highly misleading because compelling scientific evidence demonstrates that the Metamucil Powders—due to their added sugar content—actually decrease appetite control, harm blood sugar levels, and damage digestive health" (see SAC ¶ 2), and in support thereof, cite numerous scientific studies, the majority of which link sugar consumption to various diseases or health conditions (see RJN Exs. 1-30).[13] Those studies, however, concern the health consequences of consuming sugar sweetened beverages ("SSBs") such as soda (see RJN Exs. 5-12, 18, 19), or high-sugar diets in general (see RJN Exs. 15-17, 22-28, 30), which, as P&G points out, do not "remotely support the sweeping proposition that [the amount of sugar per serving in the Products] is harmful to consumers," let alone address "the effect of added sugar on a fiber supplement." (See Mot. at 14:7-9.)[14]

To the extent plaintiffs alternatively allege that the Front and Back Label Representations are false or misleading because Metamucil doesn't "help support" appetite control, healthy blood sugar, or digestive health, even if it does not harm such

---

[12] Plaintiffs' cause of action for unjust enrichment is premised on the same alleged conduct as that upon which plaintiffs' other causes of action are predicated. (See SAC ¶ 213 (incorporating each earlier allegation "as if set forth in full herein"); SAC ¶ 215 (alleging "economic benefits conferred on P&G are a direct and proximate result of its unlawful and inequitable conduct").) If plaintiffs' underlying causes of action fail, a "claim for unjust enrichment cannot stand alone as an independent claim for relief." See Hovsepian v. Apple, Inc., 2009 WL 5069144, at *5 (N.D.Cal. Dec. 17, 2009) (citing Jogani v. Superior Court, 165 Cal.App.4th 901, 911 (2008)); see also Oestreicher v. Alienware Corp., 544 F. Supp. 2d 964, 975 (N.D. Cal. 2008), aff'd, 322 F. App'x 489 (9th Cir. 2009) (holding "since plaintiff's fraud-based claims have been dismissed, plaintiff has no basis for its unjust enrichment claim").

[13] P&G's request that the Court consider the studies cited by plaintiffs as incorporated by reference in the SAC is hereby GRANTED. See Branch, 14 F.3d at 454.

[14] Several other studies upon which plaintiffs rely address topics even further removed from the claims plaintiffs allege here, in that they address, respectively, the general relationship between gut microbiome composition and diet (see RJN Ex. 20), between gut microbiome composition and susceptibility to disease (see RJN Ex. 21), and between hyperglycemia and "intestinal barrier dysfunction and risk for enteric infection" (see RJN Ex. 29).

functions, the studies on which plaintiffs rely again fail to support their allegations. In particular, to support their allegation that "when one consumes sugar, the fiber in the Metamucil Powders does not improve or help control blood sugar levels" (see SAC ¶ 36), plaintiffs rely on a 1984 study, wherein the authors tested "the effects of incorporating . . . Metamucil (7g) . . . in a drink containing 50 g glucose on plasma glucose, plasma insulin and gastric emptying" (see RJN Ex. 13). The relative amounts of fiber and sugar consumed by participants in that study, however, are markedly different from the relative amounts of fiber and sugar in the products challenged here, and, in particular, the proportional amount of fiber used in the study was substantially less than the amount of fiber contained in a serving of Metamucil.[15] See Eckler v. Wal-Mart Stores, Inc., 2012 WL 5382218, at *6-7 (S.D. Cal. Nov. 1, 2012) (granting motion to dismiss California consumer fraud claims; noting studies cited by plaintiff, which did not examine "the effectiveness of the actual [p]roduct in providing the benefits actually represented on the [p]roduct label," could not lend "facial plausibility" to her claims the challenged representations were false or misleading (internal quotation and citation omitted)).

Next, to support their allegation that "soluble fiber from psyllium–such as that in Metamucil–does not improve or support healthy blood sugar levels" (see SAC ¶ 39), plaintiffs rely on a 1993 study, wherein the authors tested the effects of various kinds of dietary fiber on glucose absorption. (See RJN Ex. 14.) That study, however, focused on "the issue of dietary fiber and blood glucose control in diabetic individuals" (see RJN Ex. 14 at 503), a population to which the Front and Back Label Statements make no reference and in which in which plaintiffs do not allege membership, see Eckler, 2012 WL

---

[15] In contrast to the 7 grams of fiber/50 grams of sugar, as used in the study, the recommended amount of the unflavored product for individuals seeking "Healthy Blood Sugar Levels" or "Digestive Health" is 3 grams of fiber/4 grams of sugar, and, for individuals seeking "Appetite Control," is 6 grams of fiber/7 grams of sugar. (See RJN Ex. 32.) Likewise differing from the proportions used in the study are the recommended amounts of the orange flavored product, which, for individuals seeking "Healthy Blood Sugar Levels" or "Digestive Health," is 3 grams of fiber/8 grams of sugar, and, for individuals seeking "Appetite Control," is 6 grams of fiber/16 grams of sugar. (See RJN Ex. 31.)

United States District Court
Northern District of California

5382218, *7 (dismissing UCL claim where studies considered effect of dietary supplement on subset of population, namely, individuals with osteoarthritis, and did not "address the far more general" representations challenged by plaintiffs).

In sum, given the "mismatch between the representations at issue and the evidence that allegedly debunks them," see id., plaintiffs fail to plead the challenged statements are either false or misleading.

Lastly, plaintiffs argue, the "unfair" prong of the UCL offers an "independent basis for relief" based on "two aspects of P&G's conduct" (see Opp. 12:14-16 (internal quotation and citation omitted)), namely, "P&G's marketing of the Metamucil Powders as supporting 'Healthy Blood Sugar Levels,' 'Appetite Control,' and 'Digestive Health'" even though they "do not actually provide those benefits" (see Opp. 12:16-18; see also SAC ¶ 108), and "P&G's practice of marketing the [sugar-containing] Metamucil Powders identically to its sugar-free products," which practice, according to plaintiffs, "conveys that the [sugar-containing] Metamucil Powders will provide health benefits identical to those of P&G's sugar-free products" (see Opp. at 12:19-21 (internal quotation and citation omitted); see also SAC ¶ 109).

To the extent the claim is based on the first of the above two alleged marketing practices, however, such allegation "overlap[s] entirely with the business practices addressed in the fraudulent and unlawful prongs of the UCL," see Hadley v. Kellogg Sales Co., 243 F. Supp. 3d 1074, 1104-05 (N.D. Cal. 2017), and, consequently, "cannot survive" where, as here, the claims under the fraudulent and unlawful prongs fail, see id. at 1105.[16] To the extent plaintiffs' claim is based on the second of the above two alleged marketing practices, such allegation likewise is unavailing, in that nowhere on the Products' labels is there any representation, either express or implied, comparing the Products to other Metamucil powders. Moreover, even if such a representation had been

[16] For purposes of the unlawful prong, the statutory violations alleged in the SAC are predicated on the same allegedly false and misleading label statements as alleged in support of the fraudulent prong.

United States District Court
Northern District of California

made, the SAC contains no facts plausibly establishing its falsity.

Accordingly, plaintiffs' causes of action, to the extent based on the Front and Back Label Statements, or the above-referenced marketing practices, are subject to dismissal.

**2. Side Label Statement**

Plaintiffs allege the Side Label Statement, "#1 Doctor Recommended," "reinforces and lends credibility to the message that Metamucil Powders are effective at providing the claimed benefits and are backed by scientific evidence because a reasonable consumer would assume doctors would not recommend a product otherwise." (See SAC ¶ 15; see also SAC ¶¶ 16-17.) As discussed above, however, plaintiffs have failed to adequately plead the falsity of the statements to which the Side Label Statement allegedly lends credibility or reinforcement. Further, to the extent plaintiffs alternatively may be challenging the Side Label Statement as a standalone misrepresentation, they have alleged no facts plausibly establishing its falsity. See VBS Distrib., Inc. v. Nutrivita Lab'ys, Inc., 697 F.App'x 543, 545 (9th Cir. 2017) (affirming dismissal of challenge to "Doctor Recommended" representation where plaintiff "provided no evidence to substantiate its claim that the statement would be misleading to the public").

Accordingly, plaintiffs' causes of action, to the extent based on the Side Label Statement, are subject to dismissal.

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

**CONCLUSION**

For the reasons stated above, defendant's motion to dismiss is hereby GRANTED and plaintiffs are hereby afforded leave to amend.[17] Plaintiffs' Third Amended Complaint, if any, shall be filed no later than June 30, 2023; plaintiffs may not, however, add any new defendants or new claims, without first obtaining leave of court. See Fed. R. Civ. P. 15(a)(2).

**IT IS SO ORDERED.**

Dated: June 8, 2023

MAXINE M. CHESNEY
United States District Judge

[17] Although plaintiffs have amended twice before, neither amendment was predicated on an order of dismissal.